UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
TACOMA DIVISION

JENNIFER DEGROSS and SHANE
DEGROSS,

*Plaintiffs,*

v.

ROSS HUNTER, in his personal
capacity and in his official capacity as
Secretary of the Washington State
Department of Children, Youth, and
Families, NATALIE GREEN, in her
official capacity as Assistant
Secretary of Child Welfare Field
Operations, RUBEN REEVES, in his
official capacity as Assistant
Secretary for Licensing, and
JEANINE TACCHINI, in her official
capacity as Senior Administrator of
Foster Care Licensing,

*Defendants.*

CASE NO.: _____

VERIFIED COMPLAINT

VERIFIED COMPLAINT
(CASE NO.: _____)
1

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

**INTRODUCTION**

Shane and Jennifer DeGross provided a loving home for foster children for nine years. Inspired by their faith, they still want to open their home to children in need. And they will happily love any child placed in their home regardless of where the child comes from or how they identify, just as they did in the past without incident. But Washington revoked their foster-care license because of their religious beliefs about human sexuality—prioritizing an ideological agenda over children's best interests by excluding capable parents who can care for children in need. That hurts the many children in foster care, discriminates against the DeGrosses, and violates the Constitution.

In 2022, the DeGrosses sought to renew their foster-care license through Olive Crest—a private licensing agency that helps to prepare applications for certification to Washington's Department of Children, Youth, and Families ("DCYF," or the "Department"). During that process, an Olive Crest licensor noted that the DeGrosses "both have a heart for serving children in [their] community," and that their "faithful ministry to children in Washington has been a blessing."

Despite their faithful service, the Department rejected the DeGrosses' application because they would not speak or act contrary to their religious convictions. Department regulations require foster parents to speak and affirm certain views on human sexuality to obtain a foster-care license. This includes agreeing to use a child's chosen pronouns, taking a child to "cultural and educational activities" like pride parades, and adopting a lifestyle that affirms the State's views on sexual and gender identities. Wash. Admin. Code § 110-148-1520(2)(d). This rule applies categorically, regardless of the services applicants seek, the ages of the children they seek to help, or the specific children eventually placed in their homes. Washington officials invoked this rule to exclude the

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1  DeGrosses from fostering *any child*, no matter their age, beliefs, or professed
2  identity.

3  But a federal district court in Washington already found a nearly identical
4  policy unconstitutional after the Department used it to exclude two other religious
5  foster-care applicants. *Blais v. Hunter*, 493 F. Supp. 3d 984 (E.D. Wash. 2020). In
6  response, the Department settled and agreed that "religious beliefs regarding
7  LGBTQ+ issues cannot serve to disqualify" applicants, and that the State cannot
8  require anyone "to express agreement with any policy regarding LGBTQ+ issues
9  that conflicts with the applicant's sincerely held religious views." Ex. A at 2.
10 Washington has decided to ignore that ruling, violate the prior injunction, and
11 keep excluding people of faith (and others) from the foster and adoption system.

12 Washington's blatant disregard for our judicial system matches its
13 disregard for the First Amendment. The State violates the DeGrosses' free-speech
14 rights by forcing them to use words like pronouns while prohibiting them from
15 expressing their deeply-held religious beliefs to a child—even if they seek to share
16 those beliefs with a teenager who shares their religious views, or even if they seek
17 to bring a toddler to church with them just one time. The State also violates the
18 DeGrosses' free-exercise rights through a policy that has many mechanisms for
19 granting exemptions—unless that person has religious objections to the
20 Department's views on gender. In that case, the Department categorically excludes
21 them, with no exceptions. But as the *Blais* court previously noted, "the
22 Department must not discriminate against a foster care applicant based on their
23 creed." *Blais*, 493 F. Supp. 3d at 1002. Exactly what Washington has done—again.

24 Washington's exclusionary practice is both illegal and wrong. The
25 DeGrosses ask this Court to prohibit the Department from categorically excluding
26 caregivers like them just because it does not like their religious views.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

JURISDICTION AND VENUE

1.    This civil-rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

2.    This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3.    This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201–02 and Fed. R. Civ. P. 57; the requested injunctive relief and damages under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and the requested costs and attorney fees under 42 U.S.C. § 1988, and Fed. R. Civ. P. 54.

4.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and (2) because a substantial part of the events and omissions giving rise to the claims occurred in the Western District of Washington; the effects of the challenged statute are felt in this District; and at least one of the Defendants can and does perform their official duties in this District.

PLAINTIFFS

5.    Jennifer (Jenn) DeGross is a United States Citizen who resides in Kitsap County, Washington.

6.    Shane DeGross is a United States Citizen who resides in Kitsap County, Washington.

DEFENDANTS

7.    Defendant Ross Hunter is the Secretary of Washington's Department of Children, Youth, and Families ("DCYF," or "the Department").

8.    The Department is responsible for overseeing and administering the Washington state foster-care system, including training and licensing foster parents. Wash. Rev. Code § 74.15.030 (listing powers and duties of the secretary of the Department).

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

9.    Defendant Hunter "has the complete charge and supervisory powers over the department," and may also "delegate any power or duty" vested in him. Wash. Rev. Code § 43.216.025.

10.    Defendant Green is the Assistant Secretary of Child Welfare Field Operations for the Department.

11.    Defendant Green exercises authority over the Department's child-welfare operations in accordance with the powers and duties delegated to her by the Secretary. Wash. Rev. Code § 43.216.025.

12.    Defendant Reeves is the Assistant Secretary for Licensing for the Department.

13.    Defendant Reeves exercises authority over the licensing operations of the Department in accordance with the powers and duties delegated to him by the Secretary. Wash. Rev. Code § 43.216.025.

14.    Jeanine Tacchini is the senior administrator for the Foster Care Licensing Division.

15.    Defendant Tacchini exercises authority over the Licensing Division's publications, policies, and licensing decisions.

16.    This lawsuit charges all of the Defendants in their official capacities.

17.    This lawsuit also charges Defendant Hunter in his personal capacity.

## FACTUAL BACKGROUND

The "crisis" in Washington's foster care system

18.    According to the Department, 4,165 children entered into Washington's foster-care system in the 2021 fiscal year.[1]

---

[1] Washington State Department of Children, Youth & Families, Annual Foster Parent and Adoptive Home Recruitment Report Draft 2021–22 (2022 DCYF Recruitment Report) at 1, https://perma.cc/HE6T-CMRT.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

19.    From 2017 to 2021, Washington's foster care system served over 10,000 children annually.[2]

20.    "As of June 30, 2021, 6,959 children and youth ages zero to seventeen were placed in out-of-home care."[3]

21.    A majority of those children were under the age of twelve, and 42.1% were between the ages of zero to ten.[4]

22.    Washington seeks to establish permanency (a stable placement) as quickly as possible for all of its children in foster care.

23.    But Washington suffers from "a shortage of caregivers willing and able to be a respite or placement resource."[5]

24.    The Department "needs active, licensed families willing to be a placement resource for children and youth placed in out-of-home care."[6]

25.    In particular, the Department needs families willing to take in children who can be more difficult to place, like children who are older, children who are part of sibling groups, children with behavioral issues, and children who are "medically fragile/medically complex."[7]

26.    According to Defendant Hunter, the Department "struggle[s] to recruit families who are willing to open their homes to teens."[8]

27.    And "DCYF continues to struggle with recruiting and retaining caregivers, specifically those with the skills, ability, and desire to parent children and youth with complex needs (extensive emotional, behavioral, and physical)."[9]

---

[2] The AFCARS Report: Washington: https://perma.cc/9FMM-29G2.
[3] 2022 DCYF Report, *supra* note 1, at 3.
[4] *Id*. at 3.
[5] *Id*. at 7.
[6] *Id*. at 7.
[7] *Id*. at 7.
[8] Ross Hunter, SOGIE Federal Rules, https://perma.cc/D44R-S877.
[9] Washington State Department of Children, Youth & Families, 2024 Annual Progress and Services Report (2024 DCYF Progress Report) at 209, https://perma.cc/79RS-53XY.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

28.     According to the 2022 annual report by the Office of the Family and Children's Ombuds, "[t]he placement resource crisis has only worsened as [the] child welfare system has experienced a significant drop in foster homes and congregate care providers in the past two years."[10]

29.     According to the 2022 report, "approximately 1,000 foster homes have either given up their foster license or have decided not to accept additional placements."[11]

30.     The Washington State Family and Children's Ombuds is an independent agency that investigates complaints against the Department, intervenes to correct policy or statutory violations, and seeks to help correct systemic issues that harm children and families.

31.     According to the Ombuds' 2023 annual report, "[d]ue to a chronic lack of placement resources, particularly for children with complex needs, for years DCYF has housed children in unlicensed placements such as hotels or night-to-night licensed foster homes until an appropriate placement became available."[12]

32.     The Department calls these types of stays in unlicensed facilities "placement exceptions."

33.     Washington placed 358 foster children in hotel rooms or other placement exceptions 4,570 times in the 2023 reporting year.[13]

34.     In the past, children and youth have sometimes slept in DCYF offices or social workers' cars.[14]

35.     For example, there were "771 'office stays' in 2021."[15]

---

[10] State of Washington, Office of the Family and Children's Ombuds, 2022 Annual Report (2022 Ombuds Report) at 3, https://perma.cc/MEQ7-7DGT.
[11] Id. at 9.
[12] State of Washington, Office of the Family and Children's Ombuds, 2023 Annual Report (2023 Ombuds Report) at 3, https://perma.cc/BCD3-L52H.
[13] Id. at 12.
[14] State of Washington, Office of the Family and Children's Ombuds, 2021 Annual Report at 16–18, https://perma.cc/4BTY-FEAZ.
[15] 2023 Ombuds Report, *supra* note 12, at 12.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

36.     The number of placement exceptions has increased six out of the last eight years—from 120 in 2015 to a peak of 4,692 placement exceptions in 2022.[16]

PLACEMENT EXCEPTIONS FOR FOSTER CHILDREN



Figure 6: Placement Exceptions, 2015-2023

37.     In the 2023 fiscal year, this included over one-hundred children under ten, including thirty-two children who were four and under, who spent at least one night in temporary housing.[17]

38.     The Ombuds director has described placement exceptions as "traumatic experiences for [foster] children."[18]

39.     According to the Ombuds office, "[h]ousing children in hotels and temporary facilities is disruptive for children and often traumatic."[19]

40.     Defendant Hunter has described the Department's use of placement exceptions as "the biggest problem [he has], operationally, in child welfare."[20]

---

[16] *Id.*
[17] Office of the Family and Children's Ombuds, DCYF Use of Hotels and Offices as Placement, 2023 Report, https://perma.cc/ET3U-8PHE.
[18] Chris Ingalls, *'A hopeless feeling': Former Washington foster child spent more than 100 nights in a hotel,* King 5, Feb. 24, 2020, https://perma.cc/A5BS-KH2B.
[19] 2023 Ombuds Report, *supra* note 12, at 6.
[20] Ingalls, *supra* note 18.

VERIFIED COMPLAINT
(CASE NO.: _____)
8

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

41.     To address the "placement resource crisis,"[21] the Department is engaged in recruitment and retention efforts to maximize the number of foster families on the Department's roster.[22]

42.     Washington law states that "[w]ithin available resources, the department shall increase the number of adoptive and foster families available to accept children through an intensive recruitment and retention program." Wash. Rev. Code 74.13.325; *see also id.* 74.13.031.

43.     The Department is engaged in an "intensive workplan" to understand the drivers of caregiver attrition and to adopt better retention strategies.[23]

44.     According to the Department, retaining foster "families is vital," because "the current placement crisis is a retention crisis, as tenured families are the ones who have the experience to take care of children and youth with higher needs."[24]

45.     The Department seeks to "attract a diverse pool of caregivers who can meet the unique needs of children placed in out-of-home care," including "caregivers who are … culturally diverse."[25]

46.     In 2021, Defendant Hunter stated: "Our [DCYF's] focus is to increase our capacity to provide welcoming and affirming homes to ALL of the children and youth we serve."[26]

47.     The Department is also seeking caregivers who are "[s]upportive of siblings staying together," "[a]ware that foster care is temporary," "[o]pen to caring for medically fragile/medically complex children," "[o]pen to caring for children with extensive emotional, behavioral, and physical needs," and "[o]pen and affirming of LGBTQIA+ youth."[27]

---

[21] 2022 Ombuds Report, *supra* note 10, at 3.
[22] 2022 DCYF Recruitment Report, *supra* note 1, at 4.
[23] 2024 DCYF Progress Report, *supra* note 9, at 209.
[24] *Id.*
[25] *Id.* at 42.
[26] SOGIE Federal Rules, *supra* note 8.
[27] 2022 DCYF Recruitment Report, *supra* note 1, at 8.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

The DeGrosses

48.    Shane and Jennifer DeGross are Christians who want to open their home to children in need.

49.    For the DeGrosses, their faith is at the center of everything they do.

50.    Following the Bible's command to live out their faith and to care for the widow and the orphan, the DeGrosses felt called to provide foster care.

51.    The DeGrosses were licensed foster parents with the State of Washington from 2013 to 2022.

52.    The DeGrosses have cared for four different girls as foster parents.

53.    Their first placement was a newborn, whom they received directly from the hospital. The DeGrosses cared for her for three months before the child's grandmother adopted her.

54.    Their second child was a two-year-old. The DeGrosses cared for her for eighteen months before she returned to her biological mother.

55.    Their third child was also a two-year-old. The DeGrosses cared for her for almost two years.

56.    Later, the DeGrosses opted to provide respite care, and cared for a three-year-old girl for two weeks.

57.    The DeGrosses have always treated their children as if they were their own by including them in family events, showing them love, affection, and treating them with respect as part of their natural family.

58.    The DeGrosses are eager to continue serving children in need through respite care and want to be certified so they can act as foster parents again in the future.

59.    And until the DeGrosses sought to renew their license in 2022, the Department never raised any concerns about the DeGrosses' capacity to care for foster children.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

<u>The licensing and placement process</u>

*The application process*

60.    To serve as foster parents, the DeGrosses must receive and retain a foster-care license from the Department.

61.    Anyone seeking to open their home to an unrelated child from foster care must obtain such a license unless they fall under an exception or obtain a discretionary waiver—like those seeking to care for a relative. Wash. Admin. Code (WAC) § 110-148-1310; Wash. Dep't for Child., Youth, & Fams., Policy 5120.[28]

62.    The initial licensure process takes approximately 120 days from application to completion.

63.    A license is valid for three years, after which foster families must renew their license. *See* WAC § 110-148-1325(2).

64.    Applicants can apply for or renew their license from the Department itself or a private "child placing" agency. WAC § 110-148-1300(1).

65.    A child-placing agency is a third-party agency licensed by the Department to perform some of the Department's responsibilities, like training foster families, placing children in adoptive homes, or renewing a foster care license. Wash. Rev. Code § 74.15.100; WAC § 110-148-1305.

66.    If an applicant applies for or seeks to renew their license through a private agency, the agency "may make application for a license on behalf of any such foster family home" to the Department. Wash. Rev. Code § 74.15.100.

67.    "The final decision for licensing is the responsibility of DCYF." WAC § 110-148-1305.

68.    The licensing process includes in-person and online video training, background and criminal-history checks, and paperwork on the applicant's medical

---

[28] Policy 5120, https://perma.cc/6SXW-C6AP. Department policies are available here: https://www.dcyf.wa.gov/practices-and-procedures.

1  and financial history. WAC §§ 110-148-1320 (training, background checks, medical

2  screening); -1375 (training); -1440–1515 (home safety requirements).

3      69.    The licensing process also involves a home study. Wash. Dep't for Child.,

4  Youth, & Fams., Policy 5110.[29]

5      70.    In fact, any person seeking to care for a child in foster care must obtain a

6  home study, "regardless of whether the applicant intends to be foster-care licensed

7  or an unlicensed caregiver." *Id.*

8      71.    The home study includes interviews with the applicant and home

9  inspections and seeks to pull together information about the applicant's family,

10  cultural background, history of trauma, health, education, finances, caregiving

11  experience, and more. *Id.*

12      72.    Renewing a foster-care license has similar, abridged requirements,

13  including a home inspection, renewal assessment, and updated background checks.

14  WAC 110-148-1340(2).

15  *Licensing standards*

16      73.    As part of the licensing process, "[t]he department or child placing agency

17  will assess" the applicant's "ability to comply with the licensing requirements."

18  WAC § 110-148-1370(1)(a).

19      74.    Private agencies must certify that a home "meet[s] the full licensing

20  requirements outlined in chapter 110-148 WAC" as part of the application to the

21  State. WAC §§ 110-147-1300; -1305 (defining "certification"); -1345 (allowing

22  agencies to certify an applicant meets licensing requirements).

23      75.    "A license shall be granted if the [applicant] meets the minimum

24  requirements set forth in" Washington's code "and the departmental requirements."

25  Wash. Rev. Code § 74.15.100.

26

---

[29] Policy 5110, https://perma.cc/ZS6G-K7YJ.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

76.    But "[t]he department has the final approval for licensing"—retaining the discretion to reject any application, even if an agency certified that the applicant met the Department's minimum requirements. WAC § 110-148-1350(5).

77.    The licensing assessment includes, "but is not necessarily limited to":

- [The applicant's] ability to comply with the licensing requirements;
- The physical condition of [their] home and property;
- The physical and mental health of all members of the household; and
- [Their] ability to provide sufficient income to meet the financial needs of your family without the foster care reimbursements for foster children in your care.

WAC § 110-148-1370(1)

78.    Other regulations similarly provide that caregivers are evaluated to ensure they can "provide a safe home," "provide the quality of care needed by children placed in [the] home," and that the caregiver can "meet training requirements." WAC § 110-148-1320(7).

79.    Washington's "[l]icensing requirements are designed to ensure children who are in foster care are safe, healthy and protected from all forms of child abuse and neglect." *See* WAC § 110-148-1300.

80.    These licensing requirements are designed to vet an applicant's *general* fitness and ability to care for children, rather than their fitness or ability to adequately care for a *specific* child. Wash. Rev. Code § 74.15.030 (setting out the Department's authority "to adopt and publish minimum requirements for licensing"); WAC § 110-148-1300 (setting out "licensing requirements for all foster homes").

81.    The Department also has the authority to license or certify caregivers to care for a specific child. Wash. Rev. Code § 74.15.120 (setting out Department's

VERIFIED COMPLAINT
(CASE NO.: _____)
13

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

authority to issue a child-specific license); WAC § 110-148-1326 (same); *see infra* ¶¶ 89–92 (describing kinship care).

*Individualized assessments*

82. While the licensing process evaluates an applicant's ability to meet the Department's minimum standards, the Department still requires individualized assessments of caregivers.

83. For example, the Department instructs child-welfare workers completing a home study to "consider how all children and families are unique and meet them where they're at."[30]

84. Licensing workers are supposed to "[c]onsider each person's uniqueness and culture when" conducting the home study, and to "[e]nsure the health, safety, and well-being of children throughout the assessment; check your bias and realize when you're applying a dominant culture lens."[31]

85. Within the past five years, the Department has provided more flexibility to license or certify caregivers according to their unique situations.

86. For example, the Department previously used a unified home-study approach that required all caregivers to meet the same requirements.

87. This meant caregivers seeking to provide foster care or to solely care for family members still had to meet "additional criteria for adoption."[32]

88. The unified home-study approach "created barriers for families and delayed the timeliness of home study completion."[33]

---

[30] Washington State Department of Children, Youth & Families, The Home Study Practice Guide at 6, https://perma.cc/R5ZQ-YEDG.
[31] *Id.*
[32] *Id.* at 4.
[33] *Id.*

VERIFIED COMPLAINT
(CASE NO.: _____)
14

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

89.   Now, the Department uses "specialized tracks" that "divide[] the home study and licensing requirements into specific types of home studies that may be completed, including Kinship Care, Kinship License, and Foster License."[34]

90.   Kinship care refers to the Department's discretion to place children with unlicensed caregivers who are "relatives or suitable other persons." Wash. Dep't for Child., Youth, & Fams., Policy 4527; *see also* Wash. Rev. Code § 74.15.020(2)(a) (listing relatives).[35]

91.   "A suitable person" is someone a) who has a preexisting relationship with a child, b) with whom the child is comfortable, c) who is able and willing to care for the child, and d) who has passed DCYF background checks. Policy 4527.

92.   This means caregivers for family or close friends need not obtain a license. Instead, they may obtain a child-specific home study that evaluates their ability to care for a specific child. Wash. Dep't for Child., Youth, & Fams., Policy 45274 ("unlicensed caregivers will have an approved home study for the child being placed"); *see generally* WAC § 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.[36]

93.   The Department also has a mechanism for granting exemptions.

94.   The Department may "make exceptions and license or continue to license [an applicant] if [they] do not meet the minimum licensing requirements" if the Department determines they "can provide for the safety, health and well-being of children in [their] care." WAC § 110-148-1630(1).

95.   The Department "*may* modify, deny, suspend, or revoke" a license for several reasons, including if a home does "not meet the licensing requirements," "cannot provide for the safety, health, and well-being of the children in [their] care," or if a home "cannot or will not support a child's cultural needs including needs

---

[34] *Id.*
[35] Policy 4527, https://perma.cc/NAQ5-VKGY.
[36] Policy 45274, https://perma.cc/AQ9E-2JG4.

VERIFIED COMPLAINT
(CASE NO.: _____)
15

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1  based on the child's race, ethnicity, religion, or SOGIE [sexual orientation, gender

2  identity, and gender expression]." WAC § 110-148-1625 (emphasis added).

3      96.    The Department allows individualized assessments because although

4  every foster home is not an appropriate placement for any child, some homes are

5  well suited to care for certain children based on kinship relationships, or shared

6  heritage, culture, or religious beliefs. *E.g.*, *infra* ¶¶ 121–31.

7      97.    The placement process similarly involves an individualized assessment of

8  a caregiver's strengths, background, and (sometimes) personal preferences, to

9  match children with families that are well suited for each other.

10      98.    For example, the Department provides prospective caregivers with

11  information about a child before a placement so that caregivers can decide whether

12  to accept the placement.

13      99.    Caregivers "have the right to decline, to admit, or keep a child in [their]

14  home, unless [their] decision violates the Washington state law against

15  discrimination." WAC § 110-148-1395(1).

16      100.    Washington's law against discrimination states: "The right to be free

17  from discrimination because of race, creed, color, national origin, citizenship or

18  immigration status, sex, honorably discharged veteran or military status, sexual

19  orientation, or the presence of any sensory, mental, or physical disability … is

20  recognized as and declared to be a civil right." Wash. Rev. Code § 49.60.030(1).

21      101.    Yet the Department grants exemptions from this requirement.

22      102.    The Department states on its website that: "Families are able to note

23  their preference for children they wish to have placed in their care.[37]

24      103.    And caregivers may categorically decline to take children based on some

25  characteristics protected under the law against discrimination.

26

---

[37] https://perma.cc/C7YN-4UEK, under: "As foster parents, do we get to choose the age and gender of the young people placed in our care?"

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

104.    The Department requires every prospective caregiver to complete a Personal Information Form collecting information on the applicant's family background, education, employment, relationships, and culture.

105.    The form includes a section asking applicants whether they would "consider providing care and support to a child" with certain behavioral or physical traits, including "medical needs," "developmental delays," "mental health diagnoses," or "learning disabilities."

| Children & Youth We Serve | | |
|---|---|---|
| What population of children do you see yourself providing care to? | | |
| Would you consider providing care and support to a child...<br><br>(Mark all that apply) | ☐ ... with trauma history?<br>☐ ... with substance abuse behaviors?<br>☐ ... with medical needs?<br>☐ ... with physically aggressive behaviors?<br>☐ ... with developmental delays? | ☐ ... with mental health diagnoses?<br>☐ ... who is a teen parent?<br>☐ ... with behavioral needs?<br>☐ ... with learning disabilities? |

106.    Using this information, the Department allows caregivers and applicants to decline to take children with mental health diagnoses, physical disabilities, medical needs, or developmental delays.

107.    The Department accommodates other types of preferences as well.

108.    The Department allows caregivers to express a preference based on sex or to categorically decline to take children of one sex.

109.    The Department allows caregivers to express a preference or to categorically decline to take children based on other characteristics as well, like age.

110.    Indeed, the Department will sometimes license caregivers for certain types of children (like children within a certain age range) and not others.

111.    Further, the Personal Information Form asks applicants: "What population of children do you see yourself providing care to?"

112.    This open-ended question gives the Department discretion to accommodate any preference on a case-by-case basis.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

113.    The Department also allows caregivers to decline to take children at the placement stage if they feel they are not a good fit based on the child's unique circumstances.

114.    According to the Department: "Foster families should never feel like they need to take a placement that they are not equipped to care for …."[38]

115.    According to the Department: "It is important for foster parents to know what is and is not a fit in their home."[39]

116.    On information and belief, the Department allows caregivers to decline children if they feel that religious differences would make the placement a poor fit.

117.    On information and belief, the Department allows caregivers to decline children if they feel that cultural differences would make the placement a poor fit.

*The "child's best interests" principle*

118.    When the Department places a child in out-of-home care, the Department seeks "a placement that is most aligned with the child's best interests, and safe, stable, and least restrictive in close proximity to the parent and the child's school when possible." Wash. Dep't for Child., Youth, & Fams., Policy 4250.[40]

119.    "If there is a conflict about a placement setting, the child's placement should be made based on what is in their best interest." *Id.*

120.    Federal spending-clause statutes applicable to Washington similarly require states to place children in "the least restrictive (most family like) and most appropriate setting available … consistent with the best interest and special needs of the child." 42 U.S.C. § 675(5).

---

[38] *Id.*, under: "Are foster parents able to determine what may or may not be a good fit in their home?"
[39] *Id.*
[40] Policy 4250, https://perma.cc/Q7P6-DWJZ.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

121.   "Preferences such as family constellation, sibling relationships, ethnicity, and religion shall be considered when matching children to foster homes." Wash. Rev. Code § 13.34.260. *See also* Policy 4250.

122.   Placing a child in out-of-home care with relatives is considered less restrictive (more family-like) than placing the child with strangers.

123.   Thus, the Department prioritizes kinship placements as the "preferred option." Wash. Rev. Code § 74.13.290; Policy 4527.

124.   "Benefits for children and youth placed in kinship care are plentiful, including minimizing trauma caused by the removal, improving the children's wellbeing, increasing permanency for children, improving behavioral and mental health outcomes, promoting sibling ties, and preserving children's cultural identity and community connections."[41]

125.   Further, "the department, absent good cause, shall follow the wishes of the natural parent regarding the placement of the child with a relative or other suitable person …." Wash. Rev. Code § 13.34.260(1).

126.   When a kinship placement is not possible, the Department may place a child with licensed caregivers like the DeGrosses.

127.   The Department seeks to match children with families that can—consistent with the child's best interests—promote cultural permanency.

128.   Cultural permanency refers to "a continuous connection to family, tradition, race, ethnicity, culture, language, and religion."[42]

129.   According to the Department, "[c]ulture is everything…. A person's cultural background includes family traditions, customs, sexual orientation, gender identity and expression (SOGIE), religious/spiritual beliefs, recreational activities, personal interests, and lifestyle."[43]

---

[41] 2022 DCYF Recruitment Report, *supra* note 1, at 3.
[42] Home Study Practice Guide, *supra* note 30, at 12.
[43] *Id.* at 13

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

130. "DCYF holds foundational beliefs that children live with people with whom they can maintain their personal and cultural identity[.]"[44]

131. Thus, "ethnicity, culture, and religion must be considered when matching a child to a foster home." Policy 4250.

132. The Department may also consider the "[r]ace, color, or national origin of the foster parent or child," so long as these traits are "not ... the basis for any delay or denial of placement." *Id.*

<u>The Department's past discrimination against religious caregivers.</u>

133. Washington law protects both children and prospective caregivers from discrimination based on traits like religion, ethnicity, or sexual orientation. Wash. Rev. Code §§ 49.60.030(1); 74.13.332 ("Foster parents have the right to be free of coercion[ and] discrimination….").

134. But in 2020, a couple successfully sued the Department for religious discrimination related to its now-repealed policy on "Supporting LGBTQ+ Identified Children and Youth." *Blais*, 493 F. Supp. 3d at 995 (cleaned up).

135. In *Blais*, the plaintiffs challenged Washington Department for Children, Youth, & Families, Policy 6900[45], which was "the Department's policy on how Department staff will make sure children who identify as LGBTQ+ have safe and affirming care." *Id.* at 991 (cleaned up).

136. Policy 6900 included a directive to "[u]se gender neutral and inclusive language," including "mirroring language the child or youth uses to describe themselves."

137. Policy 6900 required Department staff to "[u]se and allow children and youth to use a different name, pronoun and gender that reflects their LGBTQ+ identity instead of their legal name and sex assigned at birth."

---

[44] 2024 DCYF Progress Report, *supra* note 9, at 70.
[45] Policy 6900, https://perma.cc/JPF3-KSDQ?type=image.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

138.    Policy 6900 required Department staff to "[c]onsider the child or youth's LGBTQ+ identity as a factor when making placement decisions," including "[d]etermining, on a case-by-case basis, which placement option would be in the child or youth's best interest for their safety and well-being."

139.    Policy 6900 also required Department staff to "[s]upport any youth identifying as transgender and seeking gender affirming medical services."

140.    While the policy facially applied to Departmental staff, in practice it was applied to prospective foster parents as well. *Blais*, 493 F. Supp. 3d at 996.

141.    The plaintiffs in the case, James and Gail Blais, sought to care for their great-granddaughter. *Id.* at 989.

142.    The Department rejected the Blaises' license application because of their religious objections to Policy 6900.

143.    The couple subsequently sued Defendant Hunter for religious discrimination and moved for a preliminary injunction.

144.    A federal court ruled for the couple on their free-exercise claim and preliminarily enjoined the Department from using Policy 6900 to exclude "prospective foster care license applicants." *Id.* at 1001–02.

145.    Washington later agreed to a settlement and permanent injunction ending its discriminatory practices. Ex. A, B.

146.    Specifically, the injunction permanently enjoined DCYF "from requiring a foster family home license applicant or a family home study applicant to express agreement with any policy regarding LGBTQ+ issues that conflicts with the applicant's sincerely held religious views." Ex. A at 2.

147.    Under the injunction, the Department "[m]ay take an applicant's views on LGBTQ+ issues into account when reviewing foster family home license applications or family home study applications. However, the applicant's sincerely held religious beliefs regarding LGBTQ+ issues cannot serve to disqualify them." *Id.*

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

The Department's continued discrimination against religious caregivers

*The new SOGIE regulations*

148.    Because Defendant Hunter was the named defendant in *Blais v. Hunter*, Hunter knew, or should have known, about the constraints placed on the Department as part of the settlement the Department agreed to.

149.    Then, several months after the permanent injunction was issued in *Blais v. Hunter*, Defendant Hunter published a statement about Washington's non-discrimination policies.

150.    This statement was posted on the Department's website.[46]

151.    The same statement (save for one sentence that was placed in a different location) was posted on Hunter's personal website as well, under the title "WA Won't Discriminate."[47]

152.    In this statement, Hunter commented on recent changes to federal rules on "discriminating on the basis of sexual orientation, gender identity and expression, (SOGIE) or on religion."[48]

153.    According to the statement, "Washington does not allow this kind of discrimination today, and won't allow it in the future."[49]

154.    According to the statement,

> Washington requires potential foster parents to accept ALL children and youth for who they are. We do not grant licenses to families that are unwilling to be accepting of a child or youth who explores their sexual orientation, gender identity, or gender expression and comes out while in their care. The odds are too big to allow this to happen....[50]

---

[46] SOGIE Federal Rules, *supra* note 8.
[47] Ross Hunter, WA Won't Discriminate, https://perma.cc/RMV9-NEXW.
[48] *Id.*
[49] *Id.*
[50] *Id.*

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

155.    After Washington discontinued Policy 6900, the State passed new regulations requiring foster-care applicants to support and affirm a child's SOGIE.

156.    Relevant here, the Department revised Washington Administrative Code § 110-148-1520 ("§ 1520"), which provides a list of "services" foster families are "expected to provide to children in [their] care."

157.    Section 1520 states:

> …
>
> **(2) You must provide and arrange for care that is appropriate for the child's** age, **SOGIE**, and development including:
>
>> (a) Emotional support;
>>
>> (b) Nurturing and affection;
>>
>> (c) Structured daily routines and living experiences; and
>>
>> (d) Activities that promote the development of each child. This includes cultural and educational activities in your home and the community.
>
> …
>
> (6) You must follow all state and federal laws regarding nondiscrimination while providing services to children in your care. You must support and engage with foster children in your care with dignity and respect regardless of actual or perceived race, ethnicity, culture, sex, or SOGIE.
>
> **(7) You must connect a foster child with resources that supports and affirms their needs regarding** race, religion, culture, and **SOGIE. These resources include emotional and developmental support for a child's** ethnic identity and **SOGIE**, educational needs, and spiritual activities in your home and community ….
>
> …
>
> **(9) You must support a foster child's SOGIE by using their pronouns and chosen name** ….

WAC § 110-148-1520 (emphasis added).

158.    The Department requires licensing agencies to describe how an applicant will comply with § 1520 in the home study, under a section titled "Diversity, Equity and Inclusion."[51]

| Diversity, Equity and Inclusion (Shared by Applicant A & B if applicable) |
|---|

Cultural background: ▭

Support child's cultural background: ▭

Understanding racism: ▭

Support a child's religious/spiritual affiliation: ▭

Support a child's sexual orientation, gender identity, and expression (SOGIE): ▭

Support a child who identifies as lesbian, gay, bisexual, transgender, queer or questioning, intersex, asexual, and + (LGBTQIA+). The "+" represents identities not specifically named in the acronym, e.g. pansexual, gender nonbinary, and Two-Spirit: ▭

Ability to Parent: ▭

159.    The Department publishes a Home Study Practice Guide that provides information on how the Department interprets and applies § 1520's requirements.[52]

160.    The practice guide states that: "Regardless of a child's age or the age range the applicants wish to be licensed for, they must be willing to support all children and their LGBTQIA+ identity."[53]

161.    The practice guide states that: "[w]hether the child's or youth's SOGIE is known at that time, it is vital to discuss how to appropriately support those who may identify as LGBTQIA+, therefore supporting children and youth."[54]

162.    Supportive practices include:

- Using "chosen names and pronouns."

- Displaying "Pride flags or similar indicators."

---

[51] *See* Form 10-043 (Home Study), https://perma.cc/8JCR-29QB.
[52] Home Study Practice Guide, *supra* note 30, at 50.
[53] *Id.* at 55.
[54] *Id.* at 54.

VERIFIED COMPLAINT
(CASE NO.: _____)
24

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

- Having "LGBTQIA+ authors, musicians, and artists in your collections."[55]

163. The practice guide contains sample interview questions as well, like:

- How will you adapt to the request to call a child or youth by their chosen name and pronouns?
- How will you actively support a child or youth to become or remain engaged in their LGBTQIA+ related activities and community?
- How will you seek supportive and affirming medical care for the child or youth in your care?
- How will you seek supports [sic] or counseling to help yourself and your family's assimilation process and learn supportive language or strategies?

164. Defendant Hunter is responsible for overseeing and implementing the Department's regulations, including § 1520.

165. On information and belief, Defendant Hunter approved § 1520, including the requirements related to SOGIE.

166. Section 1520 is substantially similar to Policy 6900.

167. Like Policy 6900, § 1520 requires caregivers to use a child's self-selected pronouns.

168. Like Policy 6900, § 1520 requires caregivers to agree to support behavior and ideas involving hypothetical children "who might in the future develop or identify as LGBTQ+." *Blais*, 493 F. Supp. 3d at 989.

169. Like Policy 6900, the Department utilizes § 1520 to disqualify persons because of their "sincerely held religious beliefs regarding LGBTQ+ issues." Ex. A at 2.

---

[55] *Id.*

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

170.    If an applicant is not willing to use pronouns or otherwise support or affirm a child's behavior or ideas about gender identity, the Department will deny their application.

*The Department's different approach to supporting religious practices*

171.    Department regulations require caregivers to support other aspects of a child's identity as well.

172.    But the Department does not require applicants to support a child's cultural or religious identity in the same way applicants must agree to support a child's SOGIE.

173.    Washington's law against discrimination prohibits discrimination based on creed, and Department regulations prohibit discrimination against foster parents. Wash. Rev. Code §§ 49.60.030(1); 74.13.332.

174.    The Department's policy promoting culturally responsive care states that cultural permanence includes a child's ability to maintain ties to their "religious/spiritual beliefs." *Supra* ¶ 129.

175.    And § 1520 requires caregivers to "support a child's religion or spiritual practices" in various ways. WAC § 110-148-1520(8).

176.    In interpreting and applying these statutes and policies, the Department does not categorically require caregivers to agree to express messages supporting a child's religion or spirituality that violate the caregiver's own belief systems.

177.    In interpreting and applying these statutes and policies, the Department does not categorically require caregivers to engage in activities supporting a child's religion or spirituality that violate the caregiver's own belief systems.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

178.   For example, to complete the home study, an agency must "[a]ssess whether the applicants can be *respectful* of spiritual practices different than their own."[56]

179.   To assess whether a caregiver will respect a child's religious or spiritual practices, an agency asks whether the caregiver will "allow a child to actively participate in their identified religion/spiritual practices."[57]

180.   To assess whether a caregiver will respect a child's religious or spiritual practices, an agency asks whether the caregiver is "willing to adjust their personal commitments to provide a child the opportunity to participate in their religious/spiritual practices."[58]

181.   Under § 1520, to "support" a child's religious practices, caregivers must similarly agree to "to provid[e] adequate opportunities for religious or spiritual training and allowing a child meaningful participation appropriate to the child's spiritual beliefs." WAC § 110-148-1520(8).

182.   Caregivers need not categorically agree to use a child's religious texts or to say religious prayers.

183.   Caregivers need not categorically agree to affirm through their speech and behavior that a child's creed or religion is true and valid.

184.   But Department policies categorically require caregivers to agree to speak messages supporting a child's SOGIE, even if this violates the caregiver's belief system.

185.   And Department policies categorically require caregivers to agree to engage in activities supporting a child's SOGIE, even if this violates the caregiver's belief system.

---

[56] *Id.* at 53 (emphasis added).
[57] *Id.*
[58] *Id.*

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

186.    For example, to complete the home study, an agency must "[a]ssess how a family will *support* a child's SOGIE and LGBTQIA+ identity."[59]

187.    To assess whether a caregiver will support a child's SOGIE, an agency asks whether the caregiver will use chosen pronouns, display "Pride flags or similar indicators," or take a child to gay-pride parades.[60]

188.    To assess whether a caregiver will support a child's SOGIE, an agency asks whether the caregiver will support a child's desire to "explor[e] their gender identity or expression," or to "dress[] in opposite-gender clothing, [and] play[] with opposite-gender toys."[61]

189.    To assess whether a caregiver will support a child's SOGIE, an agency asks whether the caregiver will seek support or counseling to help their "assimilation process" and to "learn supportive language or strategies."[62]

190.    Under § 1520, caregivers must agree to use a child's chosen name and pronouns. WAC § 110-148-1520(9).

191.    Under § 1520, caregivers must agree to affirm through their speech and behavior that a child's professed gender identity is true and valid.[63]

The Department rejects the DeGrosses' application

192.    The DeGrosses' fostering license was set to expire in August 2022.

193.    In May of 2022, the DeGrosses began working with Olive Crest—their licensing agency—to renew their license.

194.    Nothing substantial had changed in the DeGrosses' personal circumstances since the last time they renewed their license.

---

[59] *Id.* at 50 (emphasis added).
[60] *Id.* at 54.
[61] *Id.* at 55.
[62] *Id.*
[63] *Id.*

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

195. The DeGrosses were well qualified to renew their foster-care license, except that their religious beliefs conflicted with some of the Department's new requirements set out in § 1520.

196. In late August/early September, Ashlynn McDonald—an Olive Crest licensing coordinator—began to have conversations with the DeGrosses about the updated WACs, including § 1520.

197. McDonald explained that the updated WACs required applicants to agree to support a child's SOGIE.

198. McDonald also explained that the updated WACs required applicants to concretely explain how they would support a child's SOGIE.

199. This placed the DeGrosses in a bind.

200. As Christians, the DeGrosses believe that a person's biological sex is an immutable characteristic, given by God that cannot be changed.

201. They believe that a person's male or female biology carries spiritual significance for who they are and how they interact with other people.

202. They believe that as image bearers of God, a person should live consistent with their God-given sex rather than contrary to God's design.

203. In their conversations with McDonald, the DeGrosses explained that they would love and support any child placed in their home.

204. The DeGrosses also explained that they could not say or do anything that went against their Christian faith.

205. In a September 7 email, McDonald stated: "we need to talk more about … how specifically you will approach situations that might be more uncomfortable or new to you. I need to be able to state concretely what the plan would be to deal with that situation."

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

206.    McDonald explained that "saying 'I will support a child'" was not enough. Rather, the Department "is looking for 'I will support a child by referring to him/her/them by preferred name and pronouns.'"

207.    McDonald explained that the regulations "are very specific and clear about what is and is not considered supportive for children in care," and attached a document with parts of § 1520 copied and pasted into it.

208.    McDonald also provided examples of ways in which the DeGrosses could support a child's SOGIE, like:

- Allowing a child to paint their nails "regardless of gender"
- Using and respecting a child's name and pronouns
- Taking a child to a local PRIDE event or finding an adult to chaperone them

209.    McDonald added that: "I know this may seem very stringent with no room for compromise. That is truly the way of things currently."

210.    McDonald continued: "It is clear to me that you both have a heart for serving children in your community and also for sharing the truth of Jesus with the children who enter your home."

211.    And McDonald added that: "Other families licensed within Olive Crest have had to make the personal decision of whether these requirements are something they can realistically follow."

212.    On September 22, the DeGrosses met with McDonald and her supervisor Angela Youtsey.

213.    The DeGrosses reiterated that they would love and support any child placed with them, but they would not use a child's pronouns or affirm that a child can transition to a gender that is different than their biological sex.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

214.    Afterwards, McDonald asked the DeGrosses to write in their own words their answers to the SOGIE questions on a form titled the Home-Inspection Checklist.

215.    The DeGrosses reiterated that they would "love and support any child who is placed in [their] home," but they were not "willing to use a child's preferred pronouns," or to say that a male child "can identify as a female" or vice-versa, because of their religious beliefs.

> • We will love and support any child who is placed in our home.
> • We are not willing to use a child's preferred pronouns that are contrary to their biological gender as it violates our religious beliefs.
> • We are not willing to say that a child who is a biological male can identify as a female or a child who is a biological female can identify as a male as it violates our religious beliefs.
>
> Applicant #1          Applicant #2

216.    A license or renewal application requires the preparing agency to certify that the applicants meet all of the WACs. *Supra* ¶¶ 73–74.

217.    But Olive Crest could not certify that the DeGrosses met all of the WACs because of their religious objections to using pronouns or otherwise supporting a child's desire to identify as transgender or non-binary.

218.    Olive Crest nonetheless attempted to find a work-around that would allow the DeGrosses to renew their license.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

219. Olive Crest drafted a statement as part of the renewal assessment, explaining that the Department should certify the DeGrosses even though they could not comply with the parts of § 1520 that required them to violate their beliefs.

220. In that statement, McDonald wrote that the DeGrosses were a "very loving and gracious couple who truly desire to support other foster families."

221. McDonald wrote that the DeGrosses were "organized," "flexible," able to "integrate a child/children into their family dynamics," a "strong team," and "excited to be a support to other families through providing respite care."

222. McDonald explained that the updated WACs forced the DeGrosses to violate their sincerely held beliefs, and that they wanted to open their home to children "without compromising their personal religious beliefs."

223. McDonald also wrote that the DeGrosses felt their religious objections did not "negate[] their ability to show children love and provide … a safe place to be."

224. After submitting the application to the State, the State rejected it.

225. In an email on October 13, McDonald explained that the Department would not accept the DeGrosses' application because Olive Crest could not "sign off on it with a WAC violation present."

226. McDonald explained that Youtsey's supervisor would "press the issue" with someone higher up in the Department.

227. The Department still refused to accept the application.

228. On October 24, the DeGrosses spoke to McDonald on the phone.

229. McDonald reported that her team had communicated to the Department that the DeGrosses would be used for respite care and that Olive Crest was confident that the DeGrosses could care for children without running afoul of the WACs or making children feel discriminated against.

VERIFIED COMPLAINT
(CASE NO.: _____)
32

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

230.    McDonald explained that, according to the Department, Olive Crest had to certify that the DeGrosses would "follow all WACs to the letter without any exceptions."

231.    McDonald explained that the Department was unwilling to budge and would not accept the application.

232.    McDonald also stated Olive Crest was indifferent regarding the updated WACs and § 1520.

233.    McDonald explained that Olive Crest acted only as a middleman between the Department and the applicant.

234.    McDonald stated that she had personally hoped the Department would make an exception in this case and renew the DeGrosses' license.

235.    McDonald reiterated that, according to the Department, there "were no exceptions."

236.    On November 2, the DeGrosses clarified by email whether "the only problem" with their renewal was their inability "to use a child's preferred pronouns or affirm a child's transgender identity according to the revised WACs."

237.    On November 3, McDonald confirmed that the Department's "policy change" [referring to § 1520] prevented them from being relicensed.

238.    McDonald explained that the Department would not accept their application because of "[their] stated inability to comply with recent Washington State WAC updates."

239.    The DeGrosses later learned from a different Olive Crest employee that there were other families who did not receive their licenses because they could not agree to the updated WACs.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1    <u>The DeGrosses' dilemma</u>

2    240.    The DeGrosses stand ready and able to reapply for their foster-care

3    license and desire to do so as soon as possible.

4    241.    But § 1520 requires the DeGrosses to say and do several things that

5    violate their religious beliefs about the significance of biology and sex.

6    242.    First, § 1520 facially requires applicants to agree to use a hypothetical

7    child's stated pronouns and chosen name. WAC § 110-148-1520(9).

8    243.    So applicants must agree to call a male by feminine pronouns and to call

9    a female by masculine pronouns.

10    244.    Applicants must agree to use other pronouns, like non-binary "they/them"

11    pronouns or "ze/zir" neopronouns.

12    245.    Applicants must agree to refer to children who identify as transgender,

13    non-binary, or anything else, according to their professed gender identity rather

14    than their sex.

15    246.    But the DeGrosses believe that biological sex is an immutable

16    characteristic from God that cannot be changed.

17    247.    The DeGrosses believe that they would bear false witness if they

18    expressed the view that gender can be fluid or distinct from someone's sex.[64]

19    248.    The DeGrosses cannot use inaccurate pronouns, or otherwise refer to a

20    child in a way that suggests their gender is fluid or distinct from their sex.

21    249.    Second, because § 1520 requires applicants to "support a foster child's

22    SOGIE," WAC § 110-148-1520(9), applicants must express a supportive view— and

23    only a supportive view—about a child's gender identity or associated behavior.

24    250.    This requires applicants to refrain from speaking or expressing

25    religiously informed views that people should act and identify consistent with their

26    sex.

---

[64] *See id.* at 55 ("A child's LGBTQIA+ identity is often fluid and develops over time.").

VERIFIED COMPLAINT
(CASE NO.: _____)
34

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

251.    This requires applicants to refrain from speaking or expressing views that sex is immutable and cannot be changed.

252.    This requires applicants to refrain from speaking or expressing other views on human sexuality that do not accord with the State's views on SOGIE.

253.    But the DeGrosses want to honor God in all aspects of their life, and desire to speak openly and truthfully about their faith and about our human nature with their future foster children, so long as their foster children are receptive.

254.    The DeGrosses would never force their beliefs onto a child.

255.    Rather, they want to share their beliefs in a kind and loving manner.

256.    They seek witness to their faith by living consistent with their beliefs in word and deed.

257.    So the DeGrosses would never embarrass, tease, shame, threaten, or in any way abuse a child because of how they identified, or because the child disagreed with their religious beliefs about the spiritual significance of the human body.

258.    Rather, the DeGrosses would love any child that comes into their home just as they love their own children.

259.    If the DeGrosses and a child placed with them came to disagree on any matter, the DeGrosses would seek to work through that disagreement as they do with their own children: amicably and respectfully expressing their views and listening to why a child might disagree with the DeGrosses' views or decisions.

260.    Third, because § 1520 requires applicants to facilitate a child's access to cultural, educational, and other resources that support and affirm their SOGIE, applicants must agree to participate in activities that violate their belief systems. WAC §§ 110-148-1520(2)(d) ("You must provide and arrange for care that is appropriate for the child's … SOGIE …. This includes cultural and educational activities in your home and the community."); -1520(7) ("You must connect a foster child with resources that supports and affirms their needs regarding … SOGIE.").

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

261.    This requires applicants to agree to take a child to events like pride parades that promote certain views about human sexuality. *See supra* ¶ 187.

262.    But the DeGrosses are religiously motivated to refrain from associating with events like pride parades because they convey a message about human sexuality that goes against their faith.

263.    So the DeGrosses cannot obtain a foster-care license because they will not agree to aspects of § 1520 that require them to speak or act against their faith.

264.    The DeGrosses' prior application to renew their license was denied solely because they could not comply with these aspects of § 1520.

265.    It would be futile for the DeGrosses to reapply to any public or private child-placing agency to renew their foster-care license because of § 1520.

266.    Further, the Department refuses to grant the DeGrosses an exemption from § 1520 requirements that require them to violate their religious beliefs.

267.    Section 1520 stands as a categorical bar to the DeGrosses renewing their license, regardless of the particular child the Department could place in their care, and regardless of any other circumstances which may arise.

VERIFIED COMPLAINT
(CASE NO.: _____)
36

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

LEGAL ALLEGATIONS

First Cause of Action:
First Amendment Free Speech and Free Association

268.    Plaintiffs reallege and incorporate by reference paragraphs 1–267.

269.    The First Amendment forbids any law "abridging the freedom of speech ... or the right of the people peaceably to assemble." U.S. Const. amend. I.

270.    Section 1520 requires applicants to agree to speak certain words, like self-selected pronouns, that express the Department's preferred views on human sexuality, as a condition for accessing foster-care services.

271.    Section 1520 requires applicants to engage in certain expressive activities, like pride parades, that express the Department's preferred views on human sexuality, as a condition for accessing foster-care services.

272.    Section 1520 requires applicants to stay silent and to refrain from speaking or expressing views that are different from the Department's preferred views on human sexuality as a condition for accessing foster-care services.

273.    The Department barred the DeGrosses' foster-care application because they would not agree to speak or otherwise express the Department's preferred views on human sexuality.

274.    Because § 1520 requires applicants to speak certain words and engage in certain expressive activities, the Department's policy compels speech and association.

275.    Because § 1520 requires applicants to stay silent and refrain from expressing certain views on human sexuality, the Department's policy restricts speech and association.

276.    Because § 1520 requires applicant to speak the Department's preferred views on human sexuality, or to otherwise stay silent, the Department policy regulates speech based on content and viewpoint.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

277.    The Department's discriminatory policy does not serve any valid or compelling interest in a narrowly tailored way when it infringes on the DeGrosses' free-speech and free-association rights.

278.    The Department's discriminatory policy is also facially invalid because it gives state officials unbridled discretion and imposes overbroad restrictions on speech and association.

279.    Facially and as applied, the Department's policy violates the Free Speech and Freedom of Assembly Clauses.

Second Cause of Action:
First Amendment Free Exercise

280.    Plaintiffs reallege and incorporate by reference paragraphs 1–267.

281.    The First Amendment forbids any law prohibiting or penalizing the free exercise of religion. U.S. Const. amend. I.

282.    The DeGrosses are religiously motivated to provide foster care, and religiously motivated to live out their faith at home and express their religious views on human sexuality at home.

283.    But the Department conditions their ability to provide foster care on their willingness to do things that violate their religious beliefs, like using self-selected pronouns or taking a child to pride parades.

284.    Because they are bound by their religion and conscience, the DeGrosses will not agree to speak the Department's preferred views on human sexuality, or to engage in any other activities that go against their religious beliefs.

285.    The Department's policy significantly burdens the DeGrosses' religious exercise by putting them to a choice between fidelity to their religious beliefs and serving children in foster care.

286.    The Department's policy is not neutral nor generally applicable because it provides for individualized and categorical exemptions without extending an

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

exemption to religious persons like the DeGrosses, thereby treating comparable secular conduct better than religious exercise. The policy also imposes special disabilities based on religious beliefs and works as a religious gerrymander.

287.    The Department's Policy is also not neutral because it targets the DeGrosses' religious beliefs out of religious hostility and judges their religious beliefs to be illegitimate and offensive.

288.    Because the Department's policy compels the DeGrosses to violate their faith, and the Department declines to extend an exemption to religious objectors like the DeGrosses, the policy is also inconsistent with the history and tradition of the Free Exercise Clause.

289.    Because the Department's policy compels the DeGrosses to speak and to engage in expressive activities that violate of their religious beliefs, it also burdens free-exercise rights in conjunction with free-speech and free-association rights.

290.    The Department's discriminatory policy does not serve any valid or compelling interest in a narrowly tailored way when it infringes on the DeGrosses' free-exercise rights.

291.    As applied, the Department's policy violates the Free Exercise Clause.

<u>Third Cause of Action:</u>
<u>Fourteenth Amendment: Equal Protection</u>

292.    Plaintiffs reallege and incorporate by reference paragraphs 1–267.

293.    The Fourteenth Amendment guarantees "the equal protection of the laws." U.S. Const. amend. XIV, § 1.

294.    The Department's policy categorically excludes applicants with religious beliefs the Department disfavors.

295.    By categorically excluding the DeGrosses from child welfare services because of their religious beliefs, the policy invidiously discriminates based on

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

religion and treats the DeGrosses worse than similarly situated persons who do not share their religious beliefs.

296.    As applied, the policy violates the Equal Protection Clause.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgement against Defendants and provide Plaintiffs with the following relief:

1. A declaration that the Department's policy violated and continues to violate Plaintiffs' constitutionally protected rights to free speech, free association, religious exercise, and equal protection of the law;

2. A permanent injunction to stop Defendants, and any person acting in concert with them, from enforcing the Department's policy to deny Plaintiffs a foster-care license based on their protected speech or religious exercise or to deny a foster-care license to similarly situated persons who want to engage in protected speech or religious exercise materially similar to Plaintiffs;

3. That this Court award Plaintiffs' costs and expenses in this action, including reasonable attorney fees, in accordance with 42 U.S.C. § 1988;

4. That this Court award Plaintiffs nominal and punitive damages related to Plaintiffs' claims against Defendant Hunter in his individual capacity;

5. That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment;

6. That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

7. That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiffs; and

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1    8. That this Court grant any other relief that it deems equitable and just in

2       the circumstances.

3

4    Respectfully submitted this 22nd day of March, 2024.

5

6 s/ Conrad Reynoldson          Jonathan A. Scruggs*
  Conrad Reynoldson           AZ Bar No. 030505

7 WA Bar No. 48187             Alliance Defending Freedom
  Washington Civil & Disability Advocate   15100 N. 90th Street

8 4115 Roosevelt Way NE, Suite B      Scottsdale, AZ 85260
  Seattle, WA 98105             Telephone: 480.444.0020

9 Telephone: 206.428.3172        jscruggs@adflegal.org
  conrad@wacda.com

10                      Johannes Widmalm-Delphonse*
  *Counsel for Plaintiff*          VA Bar No. 96040

11                      Alliance Defending Freedom

12                      44180 Riverside Pkwy
                      Lansdowne, VA 20176

13                      Telephone: 571.707.4655
                      jwidmalmdelphonse@adflegal.org

14

15                      *Counsel for Plaintiff*

16                      *\*Pro Hac Vice Application*
                      *Forthcoming*

17

18

19

20

21

22

23

24

25

26

VERIFIED COMPLAINT          Alliance Defending Freedom
(CASE NO.: _____)       44180 Riverside Pkwy
41                       Lansdowne, Virginia 20176
                         (571) 707-4655

## DECLARATION UNDER PENALTY OF PERJURY

I, Jennifer DeGross, have read the foregoing complaint. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the factual allegations pertaining to my personal experiences are true and correct to the best of my knowledge.

Executed this __19__ day of March, 2024, at _Kitsap County, WA._

_Jennifer DeGross_

Jennifer DeGross

VERIFIED COMPLAINT
(CASE NO.: _____)
42

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

## DECLARATION UNDER PENALTY OF PERJURY

I, Shane DeGross, have read the foregoing complaint. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the factual allegations pertaining to my personal experiences are true and correct to the best of my knowledge.

Executed this 19 day of March, 2024, at Kitsap County, WA.

Shane DeGross

VERIFIED COMPLAINT
(CASE NO.: _____)
43

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655