**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**TACOMA DIVISION**

|  |  |
|---|---|
| JENNIFER DEGROSS and SHANE DEGROSS,<br><br>*Plaintiffs,*<br><br>v.<br><br>ROSS HUNTER, in his personal capacity and in his official capacity as Secretary of the Washington State Department of Children, Youth, and Families, NATALIE GREEN, in her official capacity as Assistant Secretary of Child Welfare Field Operations, RUBEN REEVES, in his official capacity as Assistant Secretary for Licensing, and JEANINE TACCHINI, in her official capacity as Senior Administrator of Foster Care Licensing,<br><br>*Defendants.* | **CASE NO.: 3:24-CV-05225-DGE**<br><br><br><br><br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS** |

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. iii

Introduction .......................................................................................................... 1

Statement of Facts ............................................................................................... 2

Argument .............................................................................................................. 5

I.    The DeGrosses have alleged an injury to satisfy standing. ............................. 6

      A.    The DeGrosses suffered an injury when the Department refused to
            consider their license. ......................................................................... 6

      B.    The DeGrosses could not submit a completed application because of
            § 1520. .............................................................................................. 10

      C.    An order enjoining § 1520 would redress the DeGrosses' injury .......... 12

      D.    Plaintiffs' claims are ripe. .................................................................. 12

II.   The DeGrosses state plausible constitutional claims for relief. ..................... 16

      A.    Hunter is personally liable for implementing Department policies that
            cause constitutional injuries. ............................................................. 17

      B.    Sovereign immunity is not a bar to personal liability. ......................... 20

      C.    Hunter violated clearly established rights protecting religious foster
            parents. ............................................................................................. 21

      D.    The DeGrosses have stated an equal-protection claim. ........................ 24

      E.    The DeGrosses have stated a valid facial challenge to § 1520. ........... 26

Conclusion .......................................................................................................... 28

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
ii

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

### TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ................................................................. 29

*Al Saud v. Days,*
   50 F.4th 705 (9th Cir. 2022) ................................................... 30

*Alaska Right to Life Political Action Committee v. Feldman,*
   504 F.3d 840 (9th Cir. 2007) .................................................. 17

*ASARCO, LLC v. Union Pacific Railroad Company,*
   765 F.3d 999 (9th Cir. 2014) .................................................. 27

*Ayla, LLC v. Alya Skin Pty. Ltd.,*
   11 F.4th 972 (9th Cir. 2021) ................................................... 11

*Ballou v. McElvain,*
   29 F.4th 413 (9th Cir. 2022) ................................................... 26

*Bennett v. Spear,*
   520 U.S. 15 (1997) ............................................................... 2, 13

*Blais v. Hunter,*
   493 F. Supp. 3d 984 (E.D. Wash. 2020) ................... 4, 20, 26, 27, 31, 32

*California Trucking Association v. Bonta,*
   996 F.3d 644 (9th Cir. 2021) .................................................. 19

*Carson ex rel. O. C. v. Makin,*
   596 U.S. 767 (2022) ................................................................. 2

*Carter v. HealthPort Technologies, LLC,*
   822 F.3d 47 (2d Cir. 2016) ..................................................... 10

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ........................................................... 30, 31

*Department of Commerce v. New York,*
   588 U.S. 752 (2019) ................................................................. 9

*Doe v. Unocal Corporation,*
   248 F.3d 915 (9th Cir. 2001) .................................................. 10

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
iii

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

*Donovan v. Reinbold,*
  433 F.2d 738 (9th Cir. 1970) .................................................................... 27

*Fellowship of Christian Athletes v. San Jose Unified School District Board of
  Education,*
  82 F.4th 664 (9th Cir. 2023) ............................................................ 19, 28

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021) ........................................................................... 2, 28

*Furnace v. Sullivan,*
  705 F.3d 1021 (9th Cir. 2013) .................................................................. 30

*Great West Capital, LLC v. Payne,*
  No. 3:22-cv-00768-IM, 2023 WL 8600536 (D. Or. Nov. 28, 2023) .......................... 11

*Green v. Miss United States of America, LLC,*
  52 F.4th 773 (9th Cir. 2022) .................................................................... 35

*Hafer v. Melo,*
  502 U.S. 21 (1991) .................................................................................. 25

*Heilman v. Thumser,*
  No. 2:11-cv-1907, 2014 WL 6886016 (E.D. Cal. Dec. 4, 2014) ................................ 24

*Hope v. Pelzer,*
  536 U.S. 730 (2002) ................................................................................ 26

*Iancu v. Brunetti,*
  588 U.S. 388 (2019) ................................................................................ 35

*Janus v. American Federation of State, County, and Municipal Employees.,
  Council 31,*
  585 U.S. 878 (2018) ................................................................................ 29

*John Doe No. 1 v. Reed,*
  561 U.S. 186 (2010) ................................................................................ 33

*Johnson v. Clarke,*
  No. C05-5401, 2007 WL 1601292 (W.D. Wash. June 1, 2007) ................................ 23

*Larson v. Cate,*
  No. C 12-3773, 2013 WL 1502024 (N.D. Cal. Apr. 11, 2013) ................................ 23

*Lasche v. New Jersey,*
  No. 20-2325, 2022 WL 604025 (3d Cir. Mar. 1, 2022) ........................................ 28

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
iv

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

*Leite v. Crane Co.,*
   749 F.3d 1117 (9th Cir. 2014) ........................................................................ 6

*Lewis v. Clarke,*
   581 U.S. 155 (2017) ................................................................................ 24, 25

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ........................................................................................ 7

*Magassa v. Mayorkas,*
   52 F.4th 1156 (9th Cir. 2022) ...................................................................... 25

*Menard v. CSX Transportation, Inc.,*
   698 F.3d 40 (1st Cir. 2012) ......................................................................... 19

*Meriwether v. Hartop,*
   992 F.3d 492 (6th Cir. 2021) ....................................................................... 29

*Namisnak v. Uber Technologies, Inc.,*
   971 F.3d 1088 (9th Cir. 2020) ..................................................................... 12

*Oklevueha Native American Church of Hawaii, Inc. v. Holder,*
   676 F.3d 829 (9th Cir. 2012) .......................................................... 15, 16, 18

*Osolinski v. Kane,*
   92 F.3d 934 (9th Cir. 1996) ......................................................................... 26

*OSU Student Alliance v. Ray,*
   699 F.3d 1053 (9th Cir. 2012) ............................................. 21, 22, 23, 24, 30

*Patsy v. Board of Regents of State of Florida.,*
   457 U.S. 496 (1982) ..................................................................................... 14

*Peace Ranch, LLC v. Bonta,*
   93 F.4th 482 (9th Cir. 2024) .................................................................. 16, 17

*Pena v. Gardner,*
   976 F.2d 469 (9th Cir. 1992) *as amended* (Oct. 9, 1992) ......................... 25

*Perry v. Sindermann,*
   408 U.S. 593 (1972) ..................................................................................... 17

*Pistor v. Garcia,*
   791 F.3d 1104 (9th Cir. 2015) ..................................................................... 25

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

*Reitz v. County of Bucks,*
   125 F.3d 139 (3d Cir. 1997) ................................................................. 27

*Safe Air for Everyone v. Meyer,*
   373 F.3d 1035 (9th Cir. 2004) ............................................................ 6, 7

*Sea-Land Service, Inc. v. Lozen International, LLC.,*
   285 F.3d 808 (9th Cir. 2002) ................................................................ 12

*Skyline Wesleyan Church v. California Department of Managed Health Care,*
   968 F.3d 738 (9th Cir. 2020) ................................... 7, 8, 9, 12, 13, 15, 16, 18

*Sockwell v. Phelps,*
   20 F.3d 187 (5th Cir. 1994) .................................................................. 27

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) .............................................................................. 7

*Starr v. Baca,*
   652 F.3d 1202 (9th Cir. 2011) .............................................................. 21

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) .............................................................................. 15

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
   582 U.S. 449 (2017) ........................................................................ 14, 17

*United States v. Hansen,*
   599 U.S. 762 (2023) ........................................................................ 33, 34

*United States v. McLennan,*
   563 F.2d 943 (9th Cir. 1977) ................................................................ 12

*United States v. Rundo,*
   990 F.3d 709 (9th Cir. 2021) ................................................................ 33

*United States v. Salerno,*
   481 U.S. 739 (1987) .............................................................................. 32

*United States v. Williams,*
   553 U.S. 285 (2008) .............................................................................. 33

*West Virginia State Board of Education  v. Barnette,*
   319 U.S. 624 (1943) .............................................................................. 30

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1

*Yamashita v. LG Chem, Ltd.*,
   62 F.4th 496 (9th Cir. 2023) .......................................................... 6, 11, 19

2

### Rules

3

Federal Rules of Civil Procedure 8.................................................................. 20

4

Federal Rules of Civil Procedure 12............................................................. 7, 20

5

Federal Rules of Evidence 801 ...................................................................... 12

6

### Other Authorities

7

Wash. Admin. Code § 110-148-1300(1) ........................................................... 3

8

Wash. Admin. Code § 110-148-1305 ............................................................... 3

9

Wash. Admin. Code § 110-148-1310 ............................................................... 3

10

Wash. Admin. Code § 110-148-1350 ............................................................... 3

11

Wash. Admin. Code § 110-148-1520 ....................................................... passim

12

Wash. Admin. Code § 110-148-1630 .......................................................... 3, 28

13

Wash. Rev. Code § 34.05.310.......................................................................... 22

14

Wash. Rev. Code § 43.216.025......................................................................... 22

15

Wash. Rev. Code § 74.15.030......................................................................... 22

16

Wash. Rev. Code § 74.15.100............................................................................ 3

17

Webster's Third New International Dictionary (1993) ............................................ 33

18

19

20

21

22

23

24

25

26

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

### INTRODUCTION

The DeGrosses cared for children in Washington's foster-care system for nine years. Then, the Department of Children, Youth and Families ("Department") passed a policy—§ 1520—requiring them to promote the State's gender ideology. Section 1520 prevents Christian families like the DeGrosses, and others who hold similar religious beliefs, from obtaining a foster license and caring for kids in need.

The DeGrosses are Christians. They believe that God created humans male or female. They cannot say or do anything that contradicts their faith. But § 1520 requires them to speak words like pronouns based on gender identity and to "support a foster child's SOGIE" by taking children to events like pride parades. When they sought to renew their license through a private agency, they politely explained their faith-based objections to § 1520. That agency wanted to certify their application and even sought a religious exemption from the State. The Department refused. As a result, the DeGrosses lost their license.

In its response, the Department never denies the substance of its policies but tries to deflect responsibility and evade accountability. The Department argues it didn't deny the DeGrosses' license application; it just refused to consider the application. Then, the Department claims its regulations didn't cause the DeGrosses' injury; it was just the agency enforcing those regulations. And finally, the Department says Secretary Hunter wasn't personally involved in violating anyone's rights; he just oversaw and implemented the unconstitutional regulation and advocated for it on his personal blog.

The Department's finger-pointing and willful opaqueness doesn't change § 1520's plain meaning or the fact that the DeGrosses lost their license. The Department can label its refusal to accept the DeGrosses' application whatever it wants; First Amendment rights cannot be "reduced to a simple semantic exercise."

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
1

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1    *Carson ex rel. O. C. v. Makin*, 596 U.S. 767, 784 (2022) (citation omitted). Nor can

2    the Department offload responsibility for its actions on private agencies; its

3    regulations have a "determinative" effect on whether those agencies can certify

4    prospective foster parents. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). And Hunter

5    need not personally have sent out rejection letters to answer for the Department's

6    unconstitutional policy; it's sufficient that he oversaw and implemented § 1520.

7    Plus, Hunter previously agreed to a court-ordered injunction promising not to

8    engage in the same exclusionary practices challenged here. That's a "fair warning"

9    if there ever was one.

10       Besides trampling on constitutional rights, the Department's policy harms

11   the children it purports to serve. Washington "apparently prefers to risk leaving

12   children without foster parents than to allow" families like the DeGrosses to abide

13   by their faith and care for vulnerable kids. *Fulton v. City of Philadelphia*, 593 U.S.

14   522, 550 (2021) (Alito, J., concurring). Licensing religious families "threatens no

15   tangible harm"—unlike the concrete injury the DeGrosses suffered. *Id.* This Court

16   should deny Defendants' motion to dismiss and allow the case to proceed to

17   discovery.

18                            STATEMENT OF FACTS

19       *The foster-care licensing process* | To become a foster parent, applicants

20   must have a license from the Department, unless they fall under an exemption or

21   receive a discretionary waiver. Wash. Admin. Code ("WAC") § 110-148-1310; *see*

22   Verified Compl. ¶¶ 61, 93–95 (Dkt. # 1) ("Compl."). Applicants can work directly

23   with the Department or through a certified child-placing agency. WAC § 110-148-

24   1300(1). A child-placing agency may certify that an applicant meets the

25   Department's minimum requirements for licensing and prepare and submit a

26   licensing application to the Department. WAC § 110-148-1305; Wash. Rev. Code

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
2

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1 §§ 74.15.100. "The final decision for licensing is the responsibility of DCYF." WAC
2 §§ 110-148-1305, 1350(5); *see generally* Compl. ¶¶ 64–67, 76.

3      To certify an applicant's license, an agency must determine that the
4 applicant satisfies the Department's minimum licensing requirements, including
5 requirements listed in chapter 110-148 of the administrative code. Compl. ¶¶ 73–
6 74 (citing statutes). Only the Department can grant exceptions from the licensing
7 requirements. WAC § 110-148-1630. And exception denials cannot be appealed. *Id.*

8     *The Department's policies on gender identity* | In 2020, a couple sued the
9 Department for religious discrimination related to Policy 6900, entitled:
10 "Supporting LGBTQ+ Identified Children and Youth." *Blais v. Hunter*, 493 F.
11 Supp. 3d 984, 995 (E.D. Wash. 2020). Policy 6900 facially applied only to
12 Departmental staff but in practice was applied to foster parents as well. *Id.* at 996.
13 The policy required applicants to agree to use a child's stated pronouns and name,
14 use "gender neutral and inclusive language," and support a child's desire for
15 "gender affirming medical services." Compl. ¶¶ 135–39.

16     The court found that the Blaises had "raised serious questions" that Policy
17 6900 violated their free-exercise rights when it was applied to categorically
18 exclude religious families from foster care. *Blais*, 493 F. Supp. at 998. The
19 Department later settled the lawsuit and agreed to a permanent injunction ending
20 its discriminatory practices. Compl. ¶¶ 145–47. As part of that settlement, the
21 Department agreed that an "applicant's sincerely held religious beliefs regarding
22 LGBTQ+ issues cannot serve to disqualify them." Compl., Ex. A at 2.

23     Then, in 2022, the Department issued final rules revising Washington
24 Administrative Code § 110-148-1520 ("§ 1520"). Section 1520 is entitled: "What
25 services am I expected to provide for children in my care?" It provides that:

26         (2) You must provide and arrange for care that is appropriate for
the child's … SOGIE [sexual orientation, gender identity and

expression] …. This includes cultural and educational activities in your home and the community….

(7) You must connect a foster child with resources that supports and affirms their needs regarding … SOGIE….

(9) You must support a foster child's SOGIE by using their pronouns and chosen name[.]

WAC § 110-148-1520. The Department's Home Study Practice Guide states that parents "must be willing to support all children and their LGBTQIA+ identity" regardless of age. Compl. ¶ 160. Hunter has also stated that the Department does "not grant licenses to families that are unwilling to be accepting of a child or youth who explores their sexual orientation, gender identity, or gender expression[.]" *Id.* ¶¶ 153–54.

*The DeGrosses* | Shane and Jenn DeGross desire to care for children in need. *Id.* ¶ 48. They served as foster parents for almost nine years and cared for four little girls during that time. *Id.* ¶¶ 51–53. The DeGrosses desire to keep serving vulnerable kids as respite-care providers. *Id.* ¶ 58.

In 2022, the DeGrosses sought to renew their foster-care license through Olive Crest, a private child-placing agency. *Id.* ¶ 193. During the renewal process, Olive Crest explained that the Department had updated its regulations (referring to § 1520) to require "applicants to concretely explain how they would support a child's SOGIE" by using a child's stated pronouns, taking a child to pride parades, or otherwise expressing support for a child's gender expression. *Id.* ¶¶ 198, 208. The DeGrosses are devout Christians who believe that sex is an immutable characteristic that cannot be changed. *Id.* ¶¶ 200–02. The DeGrosses cannot say or do anything that goes against their faith, like using inaccurate pronouns or taking children to events like pride events. *Id.* ¶¶ 248, 262. Because of the DeGrosses' Christian beliefs, Olive Crest could not certify their application to the State. *See*

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
4

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1  *id.* ¶¶ 205–17, 230. Olive Crest sought an exemption. *Id.* ¶¶ 218–23. But the

2  Department refused to grant one. *Id.* ¶¶ 224–38.

3       In response to Defendants' Motion to Dismiss (Dkt. # 13) ("MTD"), the

4  DeGrosses asked Olive Crest to confirm what happened. Decl. of Jeff Clare ¶¶

5  9–11 (Dkt. # 23) ("Clare Decl."). According to Olive Crest, its interactions with the

6  Department "led [it] to believe that it could not certify a family" that failed to

7  comply with § 1520. *Id.* ¶ 12. Olive Crest understood that it was supposed "to

8  screen out families whose religious views conflicted with the relevant WACs." *Id.*

9  ¶ 15. Because it believed the DeGrosses were "imminently qualified," *id.* ¶ 18, it

10  communicated with the Department "to see if there was any way for them to

11  remain licensed … given their stance [on § 1520]," *id.*, Ex. 4. at 1. The

12  Department's response "affirmed" Olive Crest's understanding that families like

13  the DeGrosses could not be licensed. *Id.* ¶ 20.

14       The DeGrosses are ready and able to reapply for a foster-care license. Compl.

15  ¶ 240. But reapplying would be futile because they cannot meet § 1520's

16  requirements. *Id.* ¶¶ 241–67 (describing how § 1520 requires the DeGrosses to say

17  and do things that violate their religious beliefs).

18                                   **ARGUMENT**

19       Courts review motions to dismiss "[a]ccepting the plaintiff's allegations as

20  true and drawing all reasonable inferences in the plaintiff's favor." *Leite v. Crane*

21  *Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). When a plaintiff makes a Rule 12(b)(1)

22  "factual attack," a court need not accept *disputed* facts as true. *Safe Air for*

23  *Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). But "[u]ncontroverted

24  allegations in the complaint *are* taken as true." *Yamashita v. LG Chem, Ltd.*, 62

25  F.4th 496, 502 (9th Cir. 2023) (emphasis added). And *if* the Department alleges

26

disputed facts, "the district court may review evidence beyond the complaint." *Safe Air*, 373 F.3d at 1039.

Defendants move to dismiss the DeGrosses' claims under Rules 12(b)(1) and 12(b)(6). Neither argument has merit. The DeGrosses have (I) suffered an injury sufficient to show standing, and (II) have pleaded plausible constitutional claims.

## I.   The DeGrosses have alleged an injury to satisfy standing.

Standing requires an injury, traceable to the defendants, that a favorable ruling can redress. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The DeGrosses readily meet each requirement. The DeGrosses lost their foster-care license (an injury) because of § 1520 and the Department's refusal to grant an exemption (traceable to the Department). They ask this court to enjoin the Department from enforcing § 1520 to exclude the DeGrosses and those like them (redress). For all these reasons, their claims are also ripe.

### A.   The DeGrosses suffered an injury when the Department refused to consider their license.

1. An injury must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Defendants argue there is no injury here because the Department never formally denied the DeGrosses' application. MTD 9. The Department suggests that the problem is really "Olive Crest's unwillingness to certify … the DeGrosses." *Id.* at 9. That's incorrect. Olive Crest wanted to certify the DeGrosses' foster-care application but could not do so because of § 1520.

S*kyline* is instructive. There, a church sued California after the state told insurers they had to cover abortions in their plans. 968 F.3d at 744. The insurers dropped plans excluding abortion coverage, which prevented the plaintiff church

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
6

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1   from obtaining a plan "consistent with its beliefs." *Id.* at 745. In response to the

2   suit, California argued that the insurers had caused the injury, not California, and

3   the insurers could still request "a Skyline-tailored exemption" but hadn't done so.

4   *Id.* at 747, 749. Because the state had "not definitively ruled out granting [an

5   exemption]," California argued the church's injury was still "hypothetical." *Id.*

6       The Ninth Circuit easily found standing. Before California issued its

7   directive, the church had insurance consistent with its beliefs. *Id.* at 747. After the

8   directive, "Skyline did not have that coverage." *Id.* Because "Skyline ha[d] already

9   lost something it previously had," there was a concrete injury sufficient to show

10   standing. *Id.* at 748. Nor did the church have to take further steps to show an

11   injury, like asking an insurer to request a religious exemption. *Id.* at 747.

12       Here too, the DeGrosses already suffered an injury. When they sought to

13   renew their license, Olive Crest had to "concretely explain how [the Degrosses]

14   would support a child's SOGIE" on their renewal application. Compl. ¶ 198. They

15   had to agree to use a child's stated pronouns. *Id.* ¶¶ 206–08; WAC § 110-148-

16   1520(9). They had to agree to bring children to events like pride parades that

17   "supports and affirms their needs regarding … SOGIE." WAC § 110-148-1520(7);

18   Compl. ¶ 208. The DeGrosses could not do these things because of their Christian

19   beliefs. Compl. ¶¶ 213–15, 241–63. As a result, Olive Crest could not certify that

20   they met § 1520's requirements. *Id.* ¶ 217; Clare Decl. ¶¶ 19–21. That doomed

21   their renewal because agencies must certify that an applicant "meets the full

22   licensing requirements outlined in chapter 110-148 WAC." Compl. ¶ 74.

23       The cause and effect here is no different than in *Skyline*. Before § 1520, the

24   DeGrosses were licensed. After Washington enacted § 1520, they lost their license

25   because they could not meet the new requirements. "Article III requires no more

26   than *de facto* causality[.]" *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
7

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1  (cleaned up). In fact, this case is easier than *Skyline* because Olive Crest requested

2  a "tailored exemption" from the Department. 968 F.3d at 747; *see* Compl. ¶¶

3  218–38; Clare Decl., Ex. 4. The Department replied "in the form of a rhetorical

4  question" that "affirmed" Olive Crest's duty to screen out applicants with religious

5  objections to § 1520. Clare Decl. ¶ 20. *Skyline* said that "further steps" like

6  requesting an exemption weren't necessary for standing. 968 F.3d at 747. So

7  standing is easily satisfied here, where an exemption was sought and rejected.

8      2. The Department submits an affidavit on behalf of Defendant Jeanine

9  Tacchini. She states the Department never received "the requisite application

10  packet materials on the DeGrosses' behalf" and deduces that Olive Crest never

11  submitted a completed application to the State. Decl. of Jeanine Tacchini ¶ 8

12  (Dkt. # 14) ("Tacchini Decl.").

13      Tacchini's affidavit does not undermine standing for two reasons. First,

14  Tacchini does not dispute a single allegation in the Complaint. At most, she and

15  the Department suggest that the DeGrosses have mischaracterized the

16  Department's refusal to accept their application as a formal denial. MTD 5 (citing

17  Compl. ¶ 224). That's semantics, not a dispute of fact. *Doe v. Unocal Corp.*, 248

18  F.3d 915, 922 (9th Cir. 2001) (explaining facts must be "directly controverted" to

19  create a dispute). The Department is careful to argue it "never acted on any

20  *completed request* for a license." MTD 9 (emphasis added). But the DeGrosses

21  never alleged that Olive Crest certified their application (which is necessary for it

22  to be complete). They claim the Department *did not accept* their application

23  because Olive Crest could not certify they satisfied § 1520's requirements. Compl.

24  ¶¶ 225, 227, 231, 238. Clare's testimony confirms that Olive Crest sent the

25  Department a "snippet" of the re-licensing application. Clare Decl., Ex. 4 at 1. And

26  neither Tacchini nor the Department dispute that Olive Crest asked for an

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
8

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

exemption or that the Department denied *that* request. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) ("[T]he plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial[.]"). And despite the Department's claim that it never took "any action whatsoever vis-à-vis the DeGrosses," MTD 9, Tacchini in her affidavit never makes that broad of a claim, plus Clare has now rebutted it. *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 978 (9th Cir. 2021) ("[F]actual conflicts ... must be resolved in the plaintiff's favor." (cleaned up)).

Second, Tacchini does not dispute that "[i]t would be futile for the DeGrosses to reapply to any public or private child-placing agency ... because of § 1520." Compl. ¶ 265. The DeGrosses allege plenty of facts to support that claim, including the Department's past discrimination against religious applicants (*Id.* ¶¶ 134–42), Hunter's statement that the Department does not grant licenses to applicants like the DeGrosses (*Id.* ¶¶ 149–54), Department guidance on pronouns (*Id.* ¶¶ 159–63), and Olive Crest's failed attempts to obtain an exemption (*Id.* ¶¶ 241–67, Clare Decl. ¶ 20). All of these "[u]ncontroverted allegations in the complaint are taken as true." *Yamashita*, 62 F.4th at 502.

The Department responds that hearsay can't rebut a factual attack. MTD 9. As already explained, Tacchini's affidavit does not contradict any material facts or the substance of any (allegedly hearsay) statements, so they should also be taken as true. *Great W. Cap., LLC v. Payne*, No. 3:22-cv-00768, 2023 WL 8600536, at *5 n.5 (D. Or. Nov. 28, 2023) (collecting cases accepting uncontroverted hearsay to show jurisdiction). Besides, now Olive Crest has confirmed the DeGrosses' claims. And the Department's statements to Olive Crest are not hearsay because they are being offered against the party that made them. Fed. R. of Evid. 801(d); *Sea-Land Serv., Inc. v. Lozen Int'l, LLC.*, 285 F.3d 808, 821 (9th Cir. 2002) (admitting email

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
9

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

written by defendant's employee about "a matter within the scope of [his] employment"). Further, the Department's emails refusing the DeGrosses' exemption request falls under the verbal act exception because they're not being offered to prove that the DeGrosses are a "wonderful family" (although they are), or to prove the Department's rhetorical questions (if that's even possible). *E.g.*, Clare Decl., Ex. 4 at 2. They're offered to prove "the fact that [an exemption request] was made" and that the Department rejected it. *United States v. McLennan*, 563 F.2d 943, 947 (9th Cir. 1977).

### B.    The DeGrosses could not submit a completed application because of § 1520.

The Department next argues that the DeGrosses' injury is not traceable to the Department since it never received a completed application or issued a formal denial. MTD 9. That does not defeat traceability because § 1520 still causes the DeGrosses' injury.

Traceability requires "a causal connection between the injury and the defendant's challenged conduct." *Namisnak v. Uber Techs.*, Inc., 971 F.3d 1088, 1092 (9th Cir. 2020) (cleaned up). Defendants' actions need not "be the sole source of injury." *Skyline*, 968 F.3d at 748. It's enough if the government's "actions produce injury through their 'determinative or coercive effect upon the action of someone else.'" *Id.* (quoting *Bennett*, 520 U.S. at 169). In *Skyline*, for example, California's regulatory agency governing insurers sent out a directive saying insurers "must comply with California law with respect to the coverage of legal abortions." *Id.* "Predictably, all seven complied" and dropped plans restricting abortion coverage. *Id.* That was enough to show that the agency's actions caused the church to lose its insurance.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1    Section 1520 similarly caused and still causes the DeGrosses' injury. Private

2    agencies cannot issue a foster-care license. Compl. ¶¶ 67, 76. They can only certify

3    that an applicant meets the Department's minimum requirements, including

4    § 1520. *Id.* ¶¶ 73–74. And because the DeGrosses cannot meet § 1520's

5    requirements, the "predictable effect" is that agencies cannot certify families like

6    the DeGrosses. *Skyline*, 968 F.3d at 750. In fact, it's more than predictable; the

7    Department has sole authority to grant foster-care licenses. Compl. ¶¶ 73–74. So

8    departmental regulations have a "determinative or coercive effect upon" private

9    agencies' actions. *Skyline*, 968 F.3d at 749 (quoting *Bennett*, 520 U.S. at 169).

10   Indeed, "Olive Crest could not—legally or in good conscience—certify" families like

11   the DeGrosses. Clare Decl. ¶ 21. Olive Crest requested a "tailored exemption" too,

12   proving that the Department is the problem, not Olive Crest. 968 F.3d at 747;

13   Clare Decl., Ex. 4. Because § 1520's requirements are unequivocal, it's irrelevant

14   whether the Department itself or an agency performed the final deed. Either route

15   is a "direct chain of causation" from § 1520 to the DeGrosses' injury. *Skyline*, 968

16   F.3d at 748.

17   The Department reiterates that it never denied the DeGrosses' application.

18   MTD 9. But everyone agrees that the DeGrosses lost their license. And the

19   Department does not dispute that Olive Crest correctly applied § 1520's

20   requirements to withhold certification from the DeGrosses. And even if a denial

21   never happened, § 1520's plain terms are sufficient for pre-enforcement standing

22   too. *Infra* 15–16 (explaining this further). The Department can characterize its

23   actions however it wants; what matters is that applicants like the DeGrosses

24   cannot become foster parents.

25

26

### C.    An order enjoining § 1520 would redress the DeGrosses' injury.

The Department argues there's no redressability because this Court can't order the Department to issue a license or "reverse any actual denial." MTD 9. But the DeGrosses aren't asking for an order issuing them a license. The DeGrosses are asking for an order enjoining the Department from enforcing § 1520 to categorically disqualify them and similarly situated applicants at the door. *See* Compl. at 40. That would right the Department's wrongs by removing a categorical bar to licensing. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017) (explaining grant program that excluded churches discriminated against religion not because of "the denial of a grant," but because churches could not "compete with secular organizations").

The DeGrosses need not exhaust hypothetical administrative remedies either. *Contra* MTD 10. The Supreme Court has repeatedly "rejected [that] argument[.]" *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 500 (1982). Besides, the DeGrosses could only pursue an administrative appeal if they received a formal denial. MTD 10. But the Department conveniently forecloses that possibility by ensuring applicants like the DeGrosses cannot obtain certification or even submit a completed application to the State. Dismissing this case would allow the Department to largely insulate itself from judicial review.

### D.    Plaintiffs' claims are ripe.

1. Defendants argue that the DeGrosses' claims are not ripe based on either a past injury or a credible threat of future enforcement. MTD 10–11. A pre-enforcement claim requires "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citation omitted). Standing requirements "overlap

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
12

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1  significantly with constitutional ripeness" in this context, and in cases like this

2  one, there is "no distinction between" the two. *Skyline*, 968 F.3d at 747.

3      Whether the DeGrosses stake their claims on a past injury or a credible

4  threat of enforcement, the case is ripe because a concrete injury has already

5  occurred and continues to occur. For example, in *Oklevueha Native American*

6  *Church of Hawaii, Inc. v. Holder*, a Native American church sued the federal

7  government for declaratory and injunctive relief against a federal drug law

8  restricting their ability to use "marijuana for religious purposes." 676 F.3d 829,

9  834 (9th Cir. 2012). The district court analyzed the case as a pre-enforcement

10 challenge and dismissed the complaint because it did not think there was a

11 "genuine threat" of future enforcement. *Id.* at 835. Like the Department, the lower

12 court pointed to the lack of a "specific warning or threat to initiate proceedings."

13 *Compare id.* at 836–37, *with* MTD 10–11. But the Ninth Circuit reversed and held

14 the church's claims were ripe because the federal government previously seized a

15 pound of marijuana in transit to the church. *Id.* Past enforcement made questions

16 about "future prosecution … inapposite." *Id.* at 836.

17     Enforcement already occurred here too once the DeGrosses lost their

18 license. *Supra* § I.A. That makes the credible threat analysis an awkward fit. It's

19 supposed to prevent premature adjudications when a rule like § 1520 hasn't been

20 applied and courts "cannot make a 'firm prediction' that the future benefit will

21 actually be unavailable to the plaintiff." *Skyline*, 968 F.3d at 748. "In this case,

22 that injury has already occurred, thereby eliminating any concerns that Plaintiffs'

23 fear of enforcement is purely speculative." *Oklevueha*, 676 F.3d at 836–37; *Skyline*,

24 968 F.3d at 748 (same).

25     In any case, the DeGrosses have alleged a pre-enforcement claim too. They

26 "intend" to reapply for their foster-care license without giving up their First

1  Amendment rights. *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024)

2  (explaining course of conduct must be "arguably affected with a constitutional

3  interest" (citation omitted)); *see* Compl. ¶ 240. Their desire to speak consistent

4  with their beliefs is "arguably proscribed" by § 1520. *Bonta*, 93 F.4th at 489

5  (cleaned up). And they face a credible threat of enforcement since § 1520 was

6  already enforced against them and continues to prevent them from obtaining a

7  license or even applying for one. This last prong "often rises or falls with the

8  enforcing authority's willingness to disavow enforcement." *Id.* at 490. The

9  Department instead confirms that § 1520 means what it says. MTD 10 (refusing to

10 use pronouns would "not comply with § 1520").

11      The Department argues "there is no concrete possibility of … enforcement

12 … against the DeGrosses because *they do not have a license*." MTD 10–11. This

13 fails for two reasons. First, it misses that the injury already occurred when the

14 DeGrosses lost their license. That's sufficient. Applicants need not first lie about

15 their beliefs, obtain a license, and then give up their constitutional rights before

16 they can come to court. That would make pre-enforcement cases pointless on top of

17 subverting decades of precedent prohibiting states from leveraging important

18 benefits like licenses to punish people for exercising their constitutional rights.

19 *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (explaining unconstitutional

20 conditions doctrine). Second, as already explained, § 1520 acts as an up-front,

21 automatic disqualifier for families like the DeGrosses. That categorical exclusion is

22 an injury too. *Trinity Lutheran*, 582 U.S. at 463.

23      2. Defendants also argue that the DeGrosses' claims are not prudentially

24 ripe. Prudential ripeness turns on "the fitness of the issues for judicial review and

25 the hardship to the parties of withholding court consideration." *Alaska Right to*

26 *Life Pol. Action Comm. v. Feldman*, 504 F.3d 840, 849 (9th Cir. 2007) (cleaned up).

1 Defendants rehash their prior arguments that the DeGrosses lack an injury

2 because the Department never issued a denial. MTD 12.

3 Once again, *Oklevueha* and *Skyline* control here. In *Oklevueha*, the Ninth

4 Circuit explained that prudential ripeness matters when a plaintiff "challenges …

5 recently promulgated laws or regulations" that have yet to be applied. 676 F.3d

6 at 837. It is not a concern when the injury already occurred. *Id.*; *Skyline*, 968 F.3d

7 at 751 (making the same point). Here, Olive Crest could not certify the DeGrosses

8 as "required by the terms of" § 1520. *Skyline*, 968 F.3d at 752. And this is an even

9 easier case than *Oklevueha* or *Skyline* because Olive Crest also asked for an

10 exemption that was denied. *Oklevueha*, 676 F.3d at 838 (declining to require the

11 church to "request an exception" to show ripeness). Nor is this "an abstract

12 disagreement" because it "involves the application of well-developed law (including

13 the First Amendment right to religious freedom" and free speech) to a concrete

14 injury. *Id.*

15 For these reasons, this Court need not evaluate hardship either. There's no

16 interest "in delaying consideration of a case" when an injury has already

17 happened. *Id.* at 838–39. Still, the DeGrosses will suffer a hardship without

18 judicial review because they have no other recourse to obtain their license. They

19 cannot reapply to Olive Crest. Compl. ¶ 236 (explaining that "'the only problem'

20 with their renewal was their inability 'to use a child's preferred pronouns or affirm

21 a child's transgender identity according to the revised WACs'"). And because

22 § 1520's requirements are categorical, applying elsewhere would be futile. *Id.*

23 ¶¶ 263–67. "[S]tanding does not require exercises in futility." *Fellowship of*

24 *Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 681

25 (9th Cir. 2023) (en banc) (cleaned up). Plus, the Department's failure to disavow "is

26 strong evidence that the state intends to enforce the law" in exactly this way.

1  *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021). This Court has

2  everything it needs to decide this case now.

3  * * * * * *

4  As explained above, the Department's factual attack on the Complaint fails.

5  But at a minimum, the motion should not be granted before allowing jurisdictional

6  discovery. "Jurisdictional discovery should ordinarily be granted where pertinent

7  facts bearing on the question of jurisdiction are controverted or where a more

8  satisfactory showing of the facts is necessary." *Yamashita*, 62 F.4th at 507.

9  The Department argues that it never denied the DeGrosses' application and

10  that this Court should ignore alleged hearsay from Olive Crest. Again, these

11  arguments fail as a matter of law, especially since the DeGrosses have now

12  submitted testimony from Olive Crest. But assuming Tacchini's affidavit is at all

13  relevant, jurisdictional discovery should be permitted because the DeGrosses are

14  not privy to relevant information "in the control of the defendants," including their

15  internal (and likely unwritten) policy on how to enforce § 1520. *Menard v. CSX*

16  *Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012) (explaining "some latitude" should be

17  afforded to plausible claims "based on what is known" (cleaned up)).

18  ## II.   The DeGrosses state plausible constitutional claims for relief.

19  The Department moves to dismiss the DeGrosses' individual-capacity claims

20  against Hunter, their equal-protection claims, and their First Amendment facial-

21  relief claims under Rule 12(b)(6). Because it does not challenge the DeGrosses' as-

22  applied First Amendment claims seeking declaratory and injunctive relief against

23  the Department, those should proceed. For the remaining claims to survive, the

24  DeGrosses need only state "a short and plain statement" showing that they are

25  "entitled to relief." Fed. R. Civ. P. 8(a)(2).

26

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
16

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

The DeGrosses have pleaded sufficient facts in their Complaint. They've alleged that Defendant Hunter personally oversaw § 1520's enforcement sufficient to hold him personally responsible for their constitutional injuries. Neither sovereign nor qualified immunity are obstacles here. Indeed, Hunter was on notice that § 1520 was unconstitutional when a prior court enjoined a substantially similar policy in *Blais*, 493 F. Supp. 3d at 1001–02. The DeGrosses can also show equal-protection claims based on the Department's violation of their free-exercise rights. Finally, the DeGrosses state plausible claims for facial relief because § 1520 facially regulates speech.

## A. Hunter is personally liable for implementing Department policies that cause constitutional injuries.

The Department argues that Hunter was not "personally involved" in either rejecting their application or promulgating § 1520. MTD 14–16. But the DeGrosses' individual-capacity claims are based on Hunter's *own* actions as the Secretary, not the actions of other Department officials.

The Ninth Circuit has "long permitted plaintiffs to hold supervisors individually liable in § 1983 suits when culpable action, or inaction, is directly attributed to them." *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011). To state an individual-capacity claim, the DeGrosses need only show that Hunter "promulgated, implemented, or in some other way possessed responsibility for the continued operation of [an illegal] policy," and that the complained-of injury "occurred pursuant to that policy." *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012) (cleaned up).

*OSU* is instructive. There, a university confiscated a student-run newspaper's bins under an "unwritten," "unannounced," and previously unenforced beautification policy. *Id.* at 1064. The court had "little trouble finding

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
17

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1   constitutional violations" because the university did not confiscate bins belonging

2   to any other newspapers. *Id.* at 1058. The court also found that the university's

3   facilities director could be liable for managing the unwritten policy. *Id.* at 1076.

4   Plaintiffs did not have to show that he was personally involved in confiscating the

5   bins or that he personally "devised the newsbin policy." *Id.* In fact, they did not

6   have to show that he was even personally "aware of the policy's application against

7   the plaintiff in particular." *Id.* (citation omitted). "When a supervisory official

8   advances or manages a policy that instructs its adherents to violate constitutional

9   rights, then the official specifically intends for such violations to occur." *Id.* And

10  because the defendant was the head of facilities, and his department enforced the

11  policy that caused the paper's injury, the court readily inferred that he "oversaw

12  enforcement of the policy." *Id.* at 1077.

13          Hunter does not dispute that he oversees foster-care licensing regulations

14  like § 1520. The Secretary "has the complete charge and supervisory powers over

15  the department." Wash. Rev. Code § 43.216.025. It is "the secretary's duty" to

16  "adopt and publish minimum requirements for licensing," as well as to "issue,

17  revoke, or deny licenses" to foster parents. *Id.* § 74.15.030. If overseeing an

18  unwritten policy is sufficient for liability, overseeing a written policy must be

19  sufficient too. The Department adopted § 1520 using notice-and-comment

20  rulemaking, reflecting that the agency deliberately adopted § 1520's requirements.

21  *See generally id.* § 34.05.310.[1] "Advancing a policy that requires subordinates to

22  commit constitutional violations is always enough for § 1983 liability … so long as

23  the policy proximately causes the harm." *OSU*, 699 F.3d at 1076. And as already

24  explained, the DeGrosses have shown that § 1520 caused their injury. *Supra* § I.B.

25

26

---

[1] https://lawfilesext.leg.wa.gov/law/wsrpdf/2022/01/22-01-208.pdf.

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
18

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1     That means the DeGrosses need not show that Hunter was personally

2 involved in rejecting their application or devising the unconstitutional policy.

3 Indeed, "plaintiffs have no way of knowing, without discovery," which Department

4 officials specifically promulgated § 1520. *OSU*, 699 F.3d at 1076. At this stage, "a

5 plausible inference that [Hunter] was responsible for the continued operation" of

6 § 1520, and that § 1520 led to the DeGrosses' injury, is sufficient. *Id.*

7     Defendants cite other cases far afield from this one. In *Johnson v. Clarke*,

8 for example, a prisoner sued a department of corrections secretary for allegedly

9 changing a policy on family visitation. No. C05-5401, 2007 WL 1601292, at *2

10 (W.D. Wash. June 1, 2007). But the plaintiff didn't claim that the revised policy

11 (for which the secretary was responsible) violated his rights. *Id.* at *5 ("Plaintiff

12 argues the section of the policy was removed 'as a cover-up.'"). In *Larson v. Cate*, a

13 plaintiff similarly sued a different department of corrections secretary after

14 subordinates docked the plaintiff 20 days of credit. No. C 12-3773, 2013 WL

15 1502024, at *2 (N.D. Cal. Apr. 11, 2013). But here too, the plaintiff failed to allege

16 that there was a policy that caused the plaintiff's injury. *Id.* ("Plaintiff's amended

17 complaint does not support any assertion that Secretary Cate promulgated such a

18 policy, or that such a policy is in place."). Unlike those plaintiffs, the DeGrosses

19 seek to hold Hunter liable for an actual policy that violated their rights.

20     Finally, in *Heilman v. Thumser*, the court similarly dismissed claims

21 against a department of corrections secretary because he played no part in

22 implementing a policy *specific to one prison.* No. 2:11-cv-1907, 2014 WL 6886016,

23 at *11 (E.D. Cal. Dec. 4, 2014). But here, the DeGrosses challenge a department-

24 wide policy passed through notice-and-comment rulemaking that Hunter

25 personally promoted on his website. Compl. ¶¶ 150–54. "The inference that

26 [Hunter] oversaw enforcement of the policy flows naturally from these facts."

*OSU*, 699 F.3d at 1077. And tellingly, the Department never denies Hunter helped implement § 1520. The DeGrosses have alleged more than enough for the individual-capacity claims to survive this stage.

**B. Sovereign immunity is not a bar to personal liability.**

The Department argues that sovereign immunity protects Hunter from damages claims because challenging an agency-promulgated rule "is no different than suing the state." MTD 17. In other words, Defendants suggest that the DeGrosses make official-capacity claims disguised as individual-capacity claims. *Id.* at 16–17. And since official-capacity claims are "only nominally against the official" when they are really against the state, sovereign immunity purportedly applies. *Lewis v. Clarke*, 581 U.S. 155, 162 (2017). This misunderstands how personal liability works for government officials.

 "When determining whether an official has been sued in his official or individual capacity, we examine the capacity in which the officer is sued, not the capacity in which the officer inflicts the alleged injury." *Magassa v. Mayorkas*, 52 F.4th 1156, 1162 (9th Cir. 2022). If the plaintiff seeks relief "from the officer personally," and "not from the government treasury," the individual is the real party in interest and "cannot claim sovereign immunity from suit." *Pistor v. Garcia*, 791 F.3d 1104, 1112 (9th Cir. 2015) (cleaned up).

Here, the DeGrosses seek punitive damages from *only* Hunter. Compl. at 40. And "sovereign immunity does not erect a barrier against suits to impose individual and personal liability" in this way. *Lewis*, 581 U.S. at 163 (cleaned up). Defendants are really arguing that "state officials may not be held liable in their personal capacity for actions they take in their official capacity." *Hafer v. Melo*, 502 U.S. 21, 27 (1991). The Supreme Court has already rejected that argument. *Id.* After all, "[p]ersonal-capacity suits seek to impose individual liability upon a

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
20

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

government officer for actions taken under color of state law." *See Pena v. Gardner*, 976 F.2d 469, 473 (9th Cir. 1992) *as amended* (Oct. 9, 1992) (cleaned up). Sovereign immunity poses no problems here.

### C. Hunter violated clearly established rights protecting religious foster parents.

Defendants argue that qualified immunity protects Hunter from damages because he did not violate any clearly established law. MTD 17–19. But Hunter not only violated clearly established law protecting the constitutional rights of foster parents; he violated a court-ordered injunction too.

Qualified immunity is a doctrine about fair notice. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). To show government defendants received a "fair warning" before facing liability, *id.* at 739–40, the DeGrosses must show that, viewing the facts in their favor, Hunter's conduct "(1) violated a constitutional right that (2) was clearly established at the time of the violation," *Ballou v. McElvain*, 29 F.4th 413, 421 (9th Cir. 2022). Prior caselaw can provide sufficient notice without involving "fundamentally similar" facts. *Hope*, 536 U.S. at 741. And in the Ninth Circuit, courts look "to all available decisional law, including the law of other circuits and district courts, to determine whether the right was clearly established." *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996).

This Court need not look far for a case on point. Four years ago, prospective foster parents sued Hunter for violating their constitutional rights through a policy that was substantially similar to § 1520. *See Blais*, 493 F. Supp. 3d 984. There, the Department enforced its ideological views on foster-care applicants through Policy 6900. *Id.* at 991. They asked "hypothetical questions about hypothetical children" "who hypothetically might identify as LGBTQ+ in the future." *Id.* at 996–97. And the Department excluded parents with religious

1  objections to calling a girl "by a boy's name," or supporting a child's desire "to

2  transition." *Id.* at 990–91. Section 1520 operates the same way. *E.g.*, Compl. ¶¶

3  166–70 (describing some similarities).

4      The Department eventually settled *Blais* and agreed to a permanent

5  injunction ending its discriminatory policy. Compl., Exs. A–B.[2] As part of that

6  settlement, the Department promised not to require "a foster family home license

7  applicant or a family home study applicant to express agreement with any policy

8  regarding LGBTQ+ issues that conflicts with the applicant's sincerely held

9  religious views." *Id.*, Ex. A at 2. And the Department agreed that an "applicant's

10  sincerely held religious beliefs regarding LGBTQ+ issues cannot serve to

11  disqualify them." *Id.* Shortly after the settlement, Hunter publicly reneged on this

12  agreement. Compl. ¶¶ 149–55. Now the DeGrosses seek the same relief that the

13  injunction in *Blais* was supposed to provide. *Compare id.* at 40 (describing prayer

14  for relief), *with id.*, Ex. A. "Obviously no immunity should be granted to [] officials

15  who willfully disobeyed an order of court." *Donovan v. Reinbold*, 433 F.2d 738, 744

16  (9th Cir. 1970); *see also Reitz v. Cnty. of Bucks*, 125 F.3d 139, 147 (3d Cir. 1997);

17  *Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir. 1994).

18      Moreover, *Blais* is proof that Hunter received a fair warning because it

19  merely applied Supreme Court precedent prohibiting policies that burden First

20  Amendment rights. For example, a "bedrock" requirement of the Free Exercise

21  clause is that a government policy burdening religious exercise is not neutral or

22  generally applicable if it employs "a mechanism for individualized exemptions."

23  *Fellowship*, 82 F.4th at 686, (quoting *Fulton*, 593 U.S. at 535). In *Fulton*, for

24  example, Philadelphia revoked a Catholic adoption agency's contract with the city

25
26  [2] This Court can take judicial notice of the settlement agreement as a publicly available court document. *See ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1009 n. 2 (9th Cir. 2014) ("Because the settlement agreement was filed with the bankruptcy court and is a publicly available record, it is properly subject to judicial notice.").

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1  because the agency wanted to operate consistent with Catholic teaching about

2  marriage by referring same-sex couples to other agencies for certification. *Id.* at

3  530–31. The city claimed the agency violated a nondiscrimination policy. *Id.*

4  at 531. But that policy allowed for exemptions in the agency's "sole discretion." *Id.*

5  at 535. This "formal mechanism for granting exceptions renders a policy not

6  generally applicable," and triggers strict scrutiny if it burdens religious exercise.

7  *Id.* at 537–38.

8      The Department has the same discretionary mechanism for granting

9  individualized exemptions. *See* Compl. ¶¶ 82–117 (describing individualized

10  licensing process). Most explicitly, it can "make exceptions and license or continue

11  to license [an applicant] if [they] do not meet the minimum licensing

12  requirements." WAC § 110-148-1630(1)). And Hunter does "not identify a neutral,

13  generally applicable basis for [the Department's] treatment of the [DeGrosses].

14  Nor is such a reason apparent from the pleadings." *Lasche v. New Jersey*, No. 20-

15  2325, 2022 WL 604025, at *5 (3d Cir. Mar. 1, 2022) (remanding individual-

16  capacity claims against state officials for similarly suspending a religious couple's

17  foster-care license).

18      Hunter was also on notice that his policies violated the DeGrosses' free-

19  speech rights. The Supreme Court recently reaffirmed that "forc[ing] an individual

20  to utter what is not in her mind about a question of political and religious

21  significance …. is something the First Amendment does not tolerate." *303 Creative

22  LLC v. Elenis*, 600 U.S. 570, 596 (2023) (cleaned up). Speech about "sexual

23  orientation and gender identity …. are sensitive political topics," that merit

24  "special protection." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,

25  585 U.S. 878, 913–14 (2018) (citation omitted). And using stated pronouns as the

26  Department requires would "communicate a message: People can have a gender

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
23

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

identity inconsistent with their sex at birth." *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021) (condemning university policy compelling professor to speak pronouns against his religious beliefs).

In the face of all this, § 1520 explicitly requires foster-care applicants to agree to speak words like pronouns to obtain their license. WAC § 110-148-1520(9). Like the anti-discrimination law in *303 Creative*, Washington's policy forces an applicant "to speak contrary to her beliefs on a significant issue of personal conviction, all in order to eliminate ideas that differ from [Washington's] own." 600 U.S. at 598. To allow this would be "truly novel." *Id.* Hunter cannot feign ignorance of eighty-plus years of precedent forbidding this very thing. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943).

### D.    The DeGrosses have stated an equal-protection claim.

Defendants argue that the DeGrosses fail to state an equal-protection claim because they have not proved religious targeting. MTD 19–20. But Defendants miss that the DeGrosses' equal-protection claim is similar to their free-exercise claim.

To state an equal-protection claim, "a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (citation omitted). "Religion is a suspect class." *Al Saud v. Days*, 50 F.4th 705, 710 (9th Cir. 2022). So classifying or drawing distinctions based on "religious beliefs and practices … would violate the Equal Protection Clause unless the classification satisfies strict scrutiny." *Id.*

Equal-protection claims will often "rise and fall with [] First Amendment claims." *OSU*, 699 F.3d at 1067. Differential treatment based on religion is another way of saying the government is not neutral toward religion. *Church of*

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
24

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

*Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) ("[N]eutrality in its application requires an equal protection mode of analysis."). So showing a "discriminatory object" will state an equal-protection claim. *Id.*

Once again, *Blais* controls here. As already explained, § 1520 is the Department's not-so-subtle attempt to revive Policy 6900. Different label, same effect: parents must agree to use names and pronouns according to gender identity rather than sex, take children to events like pride parades, and unqualifiedly support ideas and beliefs about gender identity that violates their faith. *Compare* WAC § 110-148-1520(9) (discussing pronouns and "cultural and educational activities"), *with* Policy 6900[3] (also discussing pronouns and "social" and "[c]ultural activities"). And because parents must express "support," the implication is that they cannot express a different, religiously informed view about human sexuality.

*Blais* held that the Department violated free-exercise rights when it applied Policy 6900 to exclude religious foster parents at the door. Applying *Lukumi*, the court found that Policy 6900 "covertly" targeted religious beliefs to create a "religious gerrymander." *Blais*, 493 F. Supp. 3d at 995–98. First, the policy burdened "caregivers with sincere religious beliefs yet almost no others." *Id.* at 996. Second, it favored "secular viewpoints over certain religious viewpoints." *Id.* Third, the policy was "overbroad as applied" to religious parents "given many available alternatives." *Id.* at 997.

Like Policy 6900, § 1520 similarly "gerrymander[s] to create unequal effect." *Id.* at 998. It primarily excludes religious caregivers like the DeGrosses but not others. It favors secular views about human sexuality over religious views on the topic. It also "operates to bar more religious conduct than necessary to achieve its stated ends." *Id.* at 996. After all, the DeGrosses are capable of lovingly caring for

---

[3] Policy 6900 is available at this link: https://perma.cc/JPF3-KSDQ?type=image (*See* Compl. ¶ 135).

1  many children, just like they did without incident in the past. The Department

2  could place infants and toddlers with them or children who are themselves

3  religious and share their Christian beliefs. Or, instead of categorically excluding

4  the DeGrosses, the Department could "address [gender identity] issue[s] at a later,

5  more appropriate age." *Id.* at 997.

6       *Blais* found there were "serious questions" supporting an injunction

7  enjoining the Department from enforcing Policy 6900 to exclude religious foster

8  parents. *Id.* at 1001. It must be at least plausible that the same policy under a

9  different name, that also operates to exclude religious applicants, is similarly

10  discriminatory. And a discriminatory object states an equal-protection claim.

11      **E.**    **The DeGrosses have stated a valid facial challenge to § 1520.**

12       The Department argues that the DeGrosses fail to state a facial claim

13  because they cannot show that § 1520 is "invalid in any and all circumstances."

14  MTD 21 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). But that is not

15  how courts evaluate facial challenges under the First Amendment.

16       Contrary to what the Department argues, a regulation on speech can be

17  "facially unconstitutional even though it has lawful applications." *United States v.*

18  *Hansen*, 599 U.S. 762, 769 (2023). A regulation is overbroad "if it prohibits a

19  substantial amount of protected speech" relative to its "plainly legitimate sweep."

20  *United States v. Williams*, 553 U.S. 285, 292 (2008). Additionally, the DeGrosses

21  can seek semi-facial relief to cover similarly situated applicants who cannot

22  comply with § 1520's requirements. "The label is not what matters." *John Doe No.*

23  *1 v. Reed*, 561 U.S. 186, 194 (2010). The DeGrosses just have to support their legal

24  claims and claims for relief "to the extent" they go "beyond [their] particular

25  circumstances." *Id.*

26

The first step is to "determine what [§ 1520] covers." *Hansen*, 599 U.S. at 770.
It explicitly regulates pure speech like pronouns and names. Parents also have to
"support a foster child's SOGIE." WAC § 110-148-1520(9). To "support" means to
"defend as valid, right, just," to "advocate" for or "to actively promote the interests
or cause of." Webster's Third New Int'l Dictionary 2297 (1993). That covers speech.
*United States v. Rundo*, 990 F.3d 709, 716 (9th Cir. 2021) (per curiam)
(interpreting statute making it illegal to "promote, encourage, participate in, or
carry on a riot").

Since § 1520 reaches speech, the next question is whether "its applications to
protected speech … swamp its lawful applications." *Hansen*, 599 U.S. at 774.
Section 1520 covers everything a parent says. After all, parents parent through
words. Take pronouns. The Department concedes that "using a person's pronouns
and chosen name is a pervasive social practice" that happens all the time. MTD 21.
Then, to "support" a child's gender identity, parents must align everything they
say with the Department's views. Parents express their views on human sexuality
to their children in countless ways whether it's at church, over the dinner table, or
in everyday conversations when the topic arises.

The Department again seeks to narrow § 1520's reach by highlighting the
unlikely odds that foster parents must use inaccurate pronouns. MTD 21. But
§ 1520's requirements are felt long before that. The policy applies to every
caregiver of any child in foster care because *all* parents must agree to §1520's
prescriptions to receive a license. *See supra* § I.A–B. It does not matter whether
the parent seeks to adopt their grandchild (like the couple in *Blais*), provide
respite care for an infant for a few days (as the DeGrosses desire to do), or foster a
teenager who shares their religious beliefs and wants to become a missionary.
Section 1520 excludes applicants like the DeGrosses from providing care in all

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
27

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1  these instances. *See also* Compl. ¶ 160 (all parents must be willing to support

2  "LGBTQIA+ identit[ies]" no matter a child's age). The Department's concession

3  that the risks of a conflict between parent and child ever materializing is

4  speculative just goes to show how overbroad § 1520 is. *See*, *e.g.*, MTD 13, 21.

5      Finally, the Department ignores that the DeGrosses can state a valid facial

6  challenge by showing that § 1520 facially discriminates based on viewpoint. By

7  requiring the DeGrosses to express "positive" views about the Department's

8  gender ideology (like inaccurate pronouns), while prohibiting them from

9  expressing views that it considers "offensive" or insufficiently supportive, § 1520

10  compels and restricts speech and commits textbook viewpoint discrimination.

11  *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019); *accord Green v. Miss United States of*

12  *Am., LLC*, 52 F.4th 773, 783–86 (9th Cir. 2022) (forcing pageant to express

13  identity-based view of womanhood hampered its ability to express biology-based

14  view of womanhood). And a viewpoint-discriminatory rule is not "salvageable by

15  virtue of its constitutionally permissible applications." *Iancu*, 588 U.S. at 398–99.

16  CONCLUSION

17      The DeGrosses ask this Court to deny the Department's motion to dismiss.

18

19

20

21

22

23

24

25

26

RESPONSE TO MOTION TO DISMISS
CASE NO.: 3:24-CV-05225-DGE
28

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

1    I certify that this memorandum contains 8,392 words, in compliance with the

2 Local Civil Rules.

3    Respectfully submitted this 10th day of June, 2024.

4    s/ Conrad Reynoldson                          Jonathan A. Scruggs*

5    Conrad Reynoldson                             AZ Bar No. 030505
     WA Bar No. 48187                              Alliance Defending Freedom
6    Washington Civil & Disability Advocate        15100 N. 90th Street
7    4115 Roosevelt Way NE, Suite B                Scottsdale, AZ 85260
     Seattle, WA 98105                             Telephone: 480.444.0020
8    Telephone: 206.428.3172                       jscruggs@adflegal.org
     conrad@wacda.com
9                                                  Johannes Widmalm-Delphonse*
10   *Counsel for Plaintiff*                       VA Bar No. 96040
                                                   Alliance Defending Freedom
11                                                 44180 Riverside Pkwy
                                                   Lansdowne, VA 20176
12                                                 Telephone: 571.707.4655
13                                                 jwidmalmdelphonse@adflegal.org

14                                                 *Counsel for Plaintiff*
                                                   *Admitted Pro Hac Vice*
15

16

17

18

19

20

21

22

23

24

25

26