UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JENNIFER DEGROSS et al., | CASE NO. 3:24-cv-05225-DGE |
| Plaintiffs, | ORDER GRANTING IN PART |
| v. | AND DENYING IN PART |
| | MOTION TO DISMISS (DKT. NO. |
| ROSS HUNTER et al., | 51) |
| Defendants. | |

This matter comes before the Court on Defendants' motion to dismiss Plaintiffs Jennifer and Shane DeGrosses' complaint for failure to state a claim. (Dkt. No. 51.) The DeGrosses are foster parents who received a limited foster care license from the Washington Department of Children, Youth, and Families ("the Department" or "DCYF") due to their refusal to use a child's preferred name and pronouns as required by Washington Administrative Code § 110-148-1520(9), because it violates their religious beliefs. In their complaint, the DeGrosses assert three causes of actions for violation of their freedom of speech and freedom of exercise under the First Amendment, and violation of the Equal Protection Clause under the Fourteenth Amendment.

They allege Department regulations and policies on LGBTQ+ youth preclude people with certain sincerely held religious beliefs from qualifying for a foster care license or obtaining an unrestricted foster care license. For the following reasons, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss.

## I    BACKGROUND[1]

The Department and Foster Care Licensure

The Department is responsible for overseeing and administering the Washington state foster care system. *See* Wash. Rev. Code § 74.15.030. Prospective parents seeking to foster a child must obtain a foster care license from the Department. (Dkt. No. 41 at 11); Wash. Admin. Code § 110-148-1310.

Understandably, there are many requirements that an applicant must meet to obtain a foster care license. These licensing requirements "are designed to ensure children who are in foster care are safe, healthy and protected from all forms of child abuse and neglect." Wash. Admin. Code § 110-148-1300. Applicants can apply for, or renew, their license from the Department or through a private child placing agency—a third-party agency licensed by the Department to place a child or children for temporary care, continued care, or for adoption. Wash. Admin. Code § 110-148-1300(1); Wash. Rev. Code §§ 74.15.020, .100. A licensed agency "may make application for a license of behalf of any such foster family home" to the Department. Wash. Rev. Code § 74.15.100. However, the final decision for licensing is through the Department. Wash. Admin. Code § 110-148-1320. One part of the licensing process requires that the Department or child placing agency assess the applicant's "ability to comply

---

[1] Because this case is at the motion-to-dismiss stage, the Court assumes the truth of "well-pleaded factual allegations" and "reasonable inference[s]" therefrom. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–679 (2009).

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS (DKT. NO. 51) - 2

with the licensing requirements."[2]  Wash. Admin. Code § 110-148-1370(1)(a).  If an applicant meets the minimum requirements set forth in Washington's code and the Department's regulations, the Department shall issue a license.  Wash. Rev. Code § 74.15.100.

Policy § 1520 and Exemptions

Washington Administrative Code § 110-148-1520 ("Policy § 1520") identifies specific services prospective parents are required to provide for children in their care.  Specifically at issue in this case, the Department requires prospective parents to connect a foster child "with resources that supports and affirms their needs regarding . . . [sexual orientation, gender identity, and expression which are distinct identifiers everyone has ("SOGIE")]," and supporting a foster child's SOGIE "by using their pronouns and chosen name, and respecting the child's right to privacy concerning their SOGIE."  Wash. Admin. Code §§ 110-148-1305, -1520(7), (9).

However, the Department may "make exceptions and license or continue to license [an applicant] if [they] do not meet the minimum licensing requirements" if the Department determines they "can provide for the safety, health and well-being of children in [their] care."  Wash. Admin. Code § 110-148-1630(1).  If the Department grants an exemption, it "may limit or restrict [the applicant's] license and/or require [the applicant] to enter into a compliance agreement to ensure the safety and well-being" of children placed with the applicant.  Wash. Admin. Code § 110-148-1630(2).

The Department "may modify, deny, suspend, or revoke" a license when an individual does not "meet the licensing requirements," "cannot provide for the safety, health, and well-

---

[2] The licensing assessment includes but is not limited to: the applicant's ability to comply with the licensing requirements, the physical condition of the home and property, the physical and mental health of all members of the household, and the applicant's ability to provide sufficient income to meet the financial needs of their family without the foster care reimbursements for foster children in their care.  Wash. Admin. Code § 110-148-1370(1).

being of the children in [their] care," or "cannot or will not support a child's cultural needs including needs based on the child's race, ethnicity, religion, or SOGIE." Wash. Admin. Code § 110-148-1625(1)(a), (g), (h).

The DeGrosses

The DeGrosses are "Christians who want to open their home to children in need." (Dkt. No. 41 at 10.) They have "a long-standing passion for foster care and adoption[,]" and believe they have "an obligation to be available to help care for 'widows and orphans' as the Bible teaches." (Dkt. No. 54 at 5.) The DeGrosses were licensed foster parents in Washington from 2013 to 2022, during which they cared for four children. (Dkt. No. 41 at 10.) In 2022, the DeGrosses sought to renew their foster case license, and began working with their licensing agency, Olive Crest. (*Id.* at 10, 29.) During the process of seeking relicensing, the DeGrosses became aware that recent additions to the Washington Administrative Code required applicants to agree to support a child's SOGIE, which was contrary to the DeGrosses' religious beliefs. (Dkt. No. 41 at 29–30.) "As Christians, the DeGrosses believe that a person's biological sex is an immutable characteristic, given by God that cannot be changed." (*Id.* at 30.) The DeGrosses also believe that "as image bearers of God, a person should live consistent with their God-given sex rather than contrary to God's design." (*Id.*)

The DeGrosses informed Olive Crest that they would love and support any child placed with them, but they would not use a child's preferred pronouns or affirm that a child could transition to a gender different from their biological sex. (*Id.* at 31.) Based on conversations with the Department, Olive Crest was "led to believe that it could not certify a family that did not agree to uphold all of Department's licensing requirements," including Policy § 1520. (*Id.* at 33; *see also* Dkt. No. 23 at 3.) Because the DeGrosses could not follow the requirements of Policy

§ 1520 based on their religious beliefs, Olive Crest informed the DeGrosses that they were ineligible to renew their license.  (Dkt. No. 41 at 34.)  The DeGrosses assert that the Department never offered the possibility of a religious exemption to them.  (*Id.*)

The Waiver

On March 22, 2024, the DeGrosses sued Defendants, arguing the Department's actions violated their freedom of speech, freedom of association, and freedom to exercise their religion under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. (Dkt. No. 1.)  In August 2024, the parties agreed to stay all proceedings to allow the Department to consider a foster care license application from the DeGrosses.  (Dkt. No. 41 at 34; *see also* Dkt. No. 28.)

On January 23, 2025, Olive Crest submitted the DeGrosses' foster care application with a waiver request for Washington Revised Code § 110-148-1520(9) and recommended that the Department approve the DeGrosses for placement, foster care, and adoption.  (Dkt. No. 41 at 35.)  The waiver explained the DeGrosses intended to "support a child's right to privacy concerning their SOGIE," and planned to "avoid the use of pronouns which are contrary to the child's biological gender" by referring to the child by their name.  (Dkt. No. 41-3 at 2.)  The waiver further stated the DeGrosses were willing to undergo training "so long as they [were] not required to change their sincerely held religious beliefs," and agreed to work collaboratively with Olive Crest and the Department "to follow the child's case plan and ensure the best interests of the child [were] met and [the DeGrosses did not] have to personally take any action, including speech, that conflicts with their sincerely held religious beliefs."  (*Id.*)  On August 7, 2025, the Department approved the DeGrosses' waiver request.  (Dkt. No. 41 at 36.)  The waiver included the following parameters: (1) children ages 2 to 18 years old may be placed in the home for

respite care[3] and children ages 2 to 5 years old may be placed in the home for foster care; (2) Olive Crest must conduct a thorough review of a child's case plan before they are placed in the home; (3) emergency placements are prohibited to allow Olive Crest to conduct a thorough review of the individual needs of a child; (4) Olive Crest will defer a recommendation for adoption until there is an identified child; (5) a child's caseworker shall be notified of the waiver to verify that there are no known gender diverse identity considerations; and (6) the DeGrosses are required to complete LGBTQIA+ Basics for Supporting Youth in training within the first year of their license. (*Id.* at 36–37; Dkt. No. 41-3 at 3.) On September 19, 2025, the Department issued the DeGrosses a foster care license according to the limitations described. (Dkt. Nos. 41 at 37; 52 at 4.)

Procedural History

In their amended complaint, the DeGrosses argue the process for obtaining a waiver was "burdensome" and their foster care license "arbitrarily limits them to caring for only some child in only some ways," which treat the DeGrosses "worse than similarly situated foster parents with analogous conscience-based objections to supporting a child's religious or cultural identities and practices." (Dkt. No. 41 at 37–38.) Thus, the DeGrosses sued Defendants for (1) violation of First Amendment Free Speech and Free Association; (2) violation of First Amendment Free Exercise; and (3) violation of Fourteenth Amendment Equal Protection. (*Id.* at 42–45.) The DeGrosses sued all Defendants in their official capacities and sued former Department Secretary Ross Hunter in his personal capacity. (*Id.* at 1.)

On November 3, 2025, Defendants moved to dismiss the DeGrosses' complaint in its entirety for failure to state a claim upon which relief can be granted. (Dkt. No. 51.)

_____

[3] Respite care is relief care provided on a short-term basis. Wash. Admin. Code § 110-148-1600.

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS (DKT. NO. 51) - 6

## II   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b) motions to dismiss may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1988).  Material allegations are taken as admitted and the complaint is construed in the plaintiff's favor. *Keniston v. Roberts*, 717 F.2d 1295, 1300 (9th Cir. 1983).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. (internal citations omitted). The complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.  "The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.  Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001) (internal citation omitted).

## III   DISCUSSION

**A.  First Amendment Free Speech and Free Association**

The DeGrosses argue Policy § 1520—which requires prospective parents to support a foster child's SOGIE by using their pronouns and chosen name—both facially and as-applied

violates their right to free speech and the right to free association[4] by both compelling certain speech and restricting other speech.  (Dkt. No. 41 at 42–43.)

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l Inc.*, 570 U.S. 205, 213 (2013) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)).  Thus, any law that restricts speech based on content or viewpoint warrants most careful evaluation, also known as strict scrutiny.  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *see also Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (explaining that viewpoint discrimination is "an egregious form of content discrimination.")  Strict scrutiny is "the most rigid" and "most searching judicial inquiry" known to constitutional law.  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 n.3 (2023) (citations and internal quotation marks omitted).  Once First Amendment strict scrutiny governs, "it is a tall order to uphold the law as applied, for laws that are subject to this degree of judicial evaluation survive only if they are narrowly tailored to advance a compelling state interest." *Bates v. Pakseresht*, 146 F.4th 772, 784 (9th Cir. 2025).

1.    Facial Discrimination Challenge

A regulation of speech is facially content based "if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed

---

[4] The DeGrosses' first cause of action is "First Amendment Free Speech and Free Association." (Dkt. No. 41 at 42.)  However, the DeGrosses note that the First Amendment protects the "right of the people peaceably to assemble." (*Id.*)  The Court is unclear whether the DeGrosses are asserting a freedom of association or freedom of assembly claim, but notes that this case does not relate to any assembly rights, and the DeGrosses are silent as to what associational right they allege.  Thus, the Court DISMISSES this claim with leave to amend.

or the idea or message expressed.'" *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed*, 576 U.S. at 163). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Reed*, 576 U.S. at 163–164. Both types of facial distinction are "drawn based on the message a speaker conveys." *Id.* at 164. "To determine whether a speech restriction is content based or content neutral, [courts] must consider its justification and purpose, because even laws that are 'facially content neutral[ ] will be considered content-based regulations of speech' if they 'cannot be justified without reference to the content of the regulated speech, or . . . were adopted by the government because of disagreement with the message [the speech] conveys.'" *Imperial Sovereign Ct. of Montana v. Knudsen*, 170 F.4th 820, 849 (9th Cir. 2026) (quoting *Reed*, 576 U.S. at 164).

In *Bates*, the Ninth Circuit considered a civil challenge to Oregon's foster-care certification rules, one of which required foster and adoptive applicants to agree to "respect, accept, and support" a child's SOGIE. 146 F.4th at 777–778. Another rule required applicants to use a child's preferred pronouns, facilitate access to gender-transition care, and take the child to "affirming events like Pride parades." *Id.* at 781, 789. The Ninth Circuit concluded that Oregon's rule "quite clearly restrict[ed] and compel[led] speech based on both content and viewpoint" because the rule restricted certain speech by prospective parents on the topic of SOGIE, while requiring speech that aligns with the state's perspective. *Id.* at 785. Oregon's rule "virtually, by definition, 'requires positive speech and restricts negative speech in the context of

gender and sexual orientation.'" *Id.* (quoting *Bates v. Pakseresht*, No. 2:23-CV-00474-AN, 2023 WL 7546002, at *18 (D. Or. Nov. 14, 2023)).[5]

The DeGrosses have plausible alleged that Policy § 1520 draws distinctions based on the message the speaker conveys. Similar to the policy at issue in *Bates*, Policy § 1520 restricts certain speech by prospective parents on the topic of SOGIE, while requiring speech that aligns with the state's perspective. 146 F.4th at 785. "The situation would be no different if the state had restricted parental speech favoring more 'progressive' views of sexuality and gender identify, while compelling speech along the lines of [the DeGrosses'] more traditional understanding." *Id.*

Defendants argue that the DeGrosses' free speech facial challenge should fail "because they fail to plead unconstitutionality in all circumstances."[6] (Dkt. No. 51 at 8.) However, Defendants seem to ignore the DeGrosses' argument that Policy § 1520 engages in viewpoint discrimination. (*See* Dkt. No. 53 at_____.) Because the Court finds the DeGrosses have made a plausible showing that Policy § 1520 is facially invalid because of viewpoint discrimination, it need not decide Defendants' overbreadth challenge at this time. *See, e.g., Brown v. Ent. Merchs. Ass'n,* 564 U.S. 786, 799 (2011) (concluding, in a facial challenge, that a statute was a content-based speech restriction that failed strict scrutiny and affirming district court's order declaring the statute unconstitutional and permanently enjoining its enforcement, without applying

---

[5] While Defendants are correct that *Bates* dealt with a denial of an application with no attempt to accommodate the prospective parent's speech concerns, Oregon's policy on how a prospective parent should respond to a child's SOGIE is similar to the Department's policy here.

[6] This is the incorrect standard. The Supreme Court has "lowered that very high bar" in First Amendment cases; the question instead is whether "'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615, (2021)).

overbreadth analysis); *United States v. Playboy Ent. Grp., Inc.,* 529 U.S. 803, 813 (2000) (same); *see also Iancu v. Brunetti*, 588 U.S. 388, 398–399 (2019) (rejecting government's argument that the Court should apply the First Amendment overbreadth standard and uphold a viewpoint-discriminatory statute against a facial attack because "this Court has never applied that kind of analysis to a viewpoint-discriminatory law").

### 2. As-Applied Challenge

"An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (citing *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 803 & n.22 (1984)).

Defendants argue the DeGrosses' as-applied challenge fails because the Department "waived the licensing requirements that otherwise would have required use of certain pronouns, and tailored a plan designed to accommodate Plaintiffs' religious views[.]" (Dkt. No. 51 at 7.) It is true that Defendants waived the requirement that prospective foster parents use certain pronouns and preferred names for children in their care. (*See* Dkt. No. 41 at 36.) But missing from Defendant's argument is what *restrictions* the DeGrosses are subject to because of the waiver. Because the DeGrosses refuse to use a foster child's preferred name and pronouns due to their religious beliefs, their license is subject to the following parameters: they may provide only respite care for children between ages 2 to 18 and provide foster care for children ages 2 to 5 years old; a child placement agency must conduct a review of a child's case plan before the child can be placed in the DeGrosses' home; emergency placements are prohibited; adoption recommendations are deferred until a child is identified; a child's caseworker shall be notified of the waiver to verify that there are no known gender diverse identity considerations; and the

DeGrosses are required to complete LGBTQIA+ Basics for Supporting Youth in training within the first year of their license. (*Id.* at 36-37; Dkt. No. 41-3 at 3.)[7]

In essence, the Department has forced the DeGrosses to choose between forfeiting their freedom of speech to obtain an unrestricted license, or upholding their beliefs surrounding SOGIE, and receiving a less-favorable license subject to certain restrictions.

The DeGrosses have carried their burden to show that the Department's enforcement of Policy § 1520 plausibly constitutes impermissible viewpoint discrimination. Thus, the DeGrosses alleged sufficient facts to show a First Amendment violation unless the government can satisfy strict scrutiny. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 532 (2022); *Bates*, 146 F.4th at 798–800; *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1277 (9th Cir. 2017) (recognizing that viewpoint discrimination is subject to strict scrutiny). Defendants do not attempt to argue in their motion to dismiss that the Department's restrictions on the DeGrosses' protected rights served a compelling interest and are narrowly tailored. Thus, at this stage, the DeGrosses freedom of speech claim continues forward.

**B. First Amendment Free Exercise Challenge**

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const., Amend. I; *see also Cantwell v. State of Conn.*, 310 U.S. 296, 303 (1940) (holding that the First Amendment's Free Exercise Clause applies to the states through the Fourteenth Amendment). "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990). Thus, "[t]he government may not compel

---

[7] Defendants argue "Plaintiffs proposed many of the parameters they complain of[.]" (Dkt. No. 55 at 4.) Even if true, the DeGrosses were nonetheless issued a restricted license due to their ideological beliefs.

affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma." *Id.* (internal citations omitted).

But "[n]ot all burdens on religion are unconstitutional," and "[t]he state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." *United States v. Lee*, 455 U.S. 252, 257 (1982). The right to free exercise does not relieve a person from complying with a valid, neutral law of general applicability. *Smith*, 494 U.S. at 879.

Courts apply two levels of scrutiny to laws that allegedly burden religion under the Free Exercise Clause. On one hand, courts apply the "most rigorous of scrutiny" to laws burdening religion that are neither neutral nor of general application. *Church of Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Such laws will be found unconstitutional unless the government can show the law serves "a compelling interest and is narrowly tailored to advance that interest." *Id.* at 533. On the other hand, courts apply rational basis review to neutral laws of general applicability. *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075–1076 (9th Cir. 2015). "Under rational basis review, [courts] must uphold rules if they are rationally related to a legitimate governmental purpose." *Id.* at 1084.

### 1. Neutrality

A law is not neutral if "the object of [the] law is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. The DeGrosses may show "that the object or purpose of a law is the suppression of religion or religious conduct" in several ways. *Id.* But courts will first examine the law's text to determine whether it is discriminatory

on its face. *Id.* "A law lacks facially neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.*

Policy § 1520 outlines the services the Department expects potential foster parents to provide to children in their care. For example, foster parents "must follow all state and federal laws regarding nondiscrimination while providing services to children in [their] care . . . [and] must support and engage with foster children in [their] care with dignity and respect regardless of actual or perceived race, ethnicity, culture, sex, or SOGIE." Wash. Admin. Code § 110-148-1520(6). Foster parents must also "connect a foster child with resources that supports and affirms [the foster child's] needs regarding race, race, religion, culture, and SOGIE." *Id.* § 110-148-1520(7). Finally, foster parents must "support a foster child's SOGIE by using their pronouns and chosen name, and respecting the child's right to privacy concerning their SOGIE." *Id.* § 110-148-1520(9). Because the statute at issue "make no reference to any religious practice, conduct, belief, or motivation, they are facially neutral." *See Stormans*, 794 F.3d at 1076.

But, "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 638 (2018) (quoting *Lukumi*, 508 U.S. at 534). Thus, if Washington is "to respect the Constitution's guarantee of free exercise," it "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Id.* In assessing whether Washington's policy is neutral toward religion, courts must carefully examine the totality of the circumstances surrounding its application, including "the effect of [the] law in its real operation," which "is strong evidence of its object." *Lukumi*, 508 U.S. at 535, 540; *see also Masterpiece Cakeshop*, 584 U.S. at 638–639.

In *Blais v. Hunter*, the court held that a similar Washington policy violated the Free Exercise Clause as applied to the plaintiffs. The Blaises sought to serve as foster parents for their great-granddaughter, H.V., with a view to eventually adopting her. 493 F. Supp. 3d 984, 989 (E.D. Wash. 2020). The Department assigned Patrick Sager, a foster care licensor, to evaluate the Blaises' application. *Id.* at 990. As part of this evaluation, Sager assessed whether the Blaises could comply with Washington's policy for supporting LGBTQ children, known as "Policy 6900." *Id.* To this end and based on suggested questions in a home study guide, Sager asked the Blaises various hypotheticals on the topic of sexuality and gender identity. *Id.*

The Blaises, who are devout Seventh-day Adventists, responded that they could not comply with these aspects of the state's policy. *Id.* The state eventually denied the Blaises' foster care application because the Blaises "have been unwilling to agree to provide safe and affirming support to a child who is or may identify as LGBTQ+." *Id.* at 992.

The court held that the state's application of Policy 6900 to the Blaises violated the Free Exercise Clause. The court first concluded that Washington's denial of the Blaises' application was subject to strict scrutiny because Washington's policies were not neutral toward religion. *Id.* at 993–998. Although the policies were "facially neutral" and applied to all foster care applicants, the court observed that "[c]loser inspection of the regulations and policies at issue reveals that, in practice, they work to burden potential caregivers with sincere religious beliefs yet almost no others." *Id.* at 996 (citing *Lukumi*, 508 U.S. at 536). Indeed, "[f]or the most part, the only foster care applicants who might object to supporting certain issues LGBTQ+ children might face will likely do so on religious grounds." *Id.* Because "to be eligible for a foster care license, the Department required the Blaises to divorce themselves from their religious beliefs," Washington's policy could not be regarded as neutral. *Id.* at 997. As the court concluded:

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS (DKT. NO. 51) - 15

> Department regulations and policies appear neutral but in practice gerrymander to create unequal effect.  As applied to the Blaises and others similarly situated, the regulations and policies disproportionately exclude persons who observe certain religious faiths from qualifying as foster parents based solely on speculative future conduct.  In operation, Department regulations and policies eliminate a not insignificant cross-section of otherwise qualified persons from serving as potential caregivers based on their faith's stance on sexual orientation and gender identity and whether their religion supports certain issues LGBTQ+ youth might face.

*Id.* at 998.  The court further held that the state's policy was not generally applicable (further justifying strict scrutiny), and that the policy failed strict scrutiny as applied to the Blaises because the state had less restrictive means of promoting the welfare of LGBTQ children short of denying the Blaises' application.  *Id.* at 998–1001.  The Court concludes that the DeGrosses have pled sufficient facts to plausibly show that Policy § 1520, like Policy 6200 in *Blais*, is not neutral toward religion.

In addition, the "Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (quoting *Lukumi*, 508 U.S. at 533); *see also Smith*, 494 U.S. at 877 (reiterating the Free Exercise Clause protects against the government's imposition of "special disabilities on the basis of religious views or religious status").

In *Trinity Lutheran*, for example, the Supreme Court addressed a Missouri state constitutional provision that prohibited the state from giving public benefits to religious institutions.  582 U.S. at 454–455.  The church had applied to participate in a state program that gave grants to nonprofit organizations that repaved surfaces with material made from recycled tires. *Id.* at 454.  The state pointed out that declining to issue the grant to the church in no way

infringed on its religious exercise and noted that it had no duty to give the grant in the first place. *Id.* at 462–463. But the Court disagreed:

> [T]he Department's policy puts Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain a religious institution.  Of course, Trinity Lutheran is free to continue operating as a church, just as McDaniel was free to continue being a minister.  But that freedom comes at the cost of automatic and absolute exclusion from the benefits of a public program for which the Center is otherwise fully qualified.  And when the State conditions a benefit in this way, *McDaniel* says plainly that the State has punished the free exercise of religion: "To condition the availability of benefits . . . upon [a recipient's] willingness to . . . surrender[ ] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties."

*Id.* at 462 (quoting *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (plurality opinion)).  The Court emphasized it "has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.'" *Id.* at 458.  *Trinity Lutheran* thus reaffirms that the government may not impose special disability or withhold government benefits because of one's religion.  *See id.*; *see also McDaniel*, 435 U.S. at 626.

Like the policy at issue in *Trinity Lutheran*, the DeGrosses plausibly allege the Department's policy at issue here puts the DeGrosses in an unfair predicament: they may obtain an unrestricted foster care license but only if they disavow their religious beliefs.  The DeGrosses are free to worship, but that freedom comes with a cost: abandoning the chance to receive a foster care license without limitations.  *Trinity Lutheran* makes clear "that such a policy imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny."  582 U.S. at 462.

## 2.   General applicability

Though interrelated, and the failure to satisfy the neutrality requirement likely shows a law does not satisfy the general applicability requirement, courts must analyze each principle

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS (DKT. NO. 51) - 17

separately. *Stormans*, 794 F.3d at 1076. General applicability requires, among other things, that the laws be enforced in an evenhanded manner. *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022). "A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.' Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny." *Kennedy*, 597 U.S. at 526 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021)).

"A law is not generally applicable if it 'invites' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (citations omitted). Moreover, "[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given." *Id.* at 537 (citations omitted). That is so because such a policy "'invites' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id.* When applicable rules give state actors "unfettered discretion" unrestricted by "particularized, objective criteria," courts apply strict scrutiny. *See Stormans*, 794 F.3d at 1081–1082.

Here, the DeGrosses submitted an exemption request along with foster-care application. (Dkt. No. 41 at 34.) As conceded by Defendants, Washington Administrative Code § 110-148-1630 provides the Department with discretion "to issue waivers or make exceptions as appropriate." (Dkt. No. 51 at 4.) Washington Administrative Code §110-148-1630 specifically stated that the Department "may make exceptions and license or continue to license [prospective foster parents] if [they] do not meet the minimum licensing requirements if [the Department]

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS (DKT. NO. 51) - 18

finds that [they] can provide for the safety, health and well-being of children in [their] care." Defendants state that a Department Licensing Division Senior Administrator can approve the waiver request but do not state what criteria are considered when deciding whether to approve a waiver. (*See* Dkt. No. 51 at 5.) A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions. *Fulton*, 593 U.S. at 533. "Properly interpreted, *Fulton* counsels that the mere existence of a discretionary mechanism to grant exemptions can be sufficient to render a policy not generally applicable, regardless of the actual exercise." *Fellowship of Christian Athletes v. San Jose Unified School District*, 82 F.4th 664, 687–688 (9th Cir. 2023) (en banc) (citation omitted).

In short, the DeGrosses have carried their burden, at the motion to dismiss stage, to show that § 1520 is neither neutral nor generally applicable. Thus, the DeGrosses alleged sufficient facts to show a First Amendment violation of freedom of religion unless Defendants can satisfy strict scrutiny. Based on the limited record before it, the Court is unable to determine at this time whether Defendants can satisfy strict scrutiny. Thus, the DeGrosses' freedom of religion claim survives the motion to dismiss.

### C. Fourteenth Amendment Equal Protection

The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying to "any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV § 1. The clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To survive a motion to dismiss, plaintiffs raising these claims must allege "intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent"

in their complaints. *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1026 (9th Cir. 1998).

"The central inquiry in an Equal Protection Clause claim is whether a government action was motivated by a discriminatory purpose." *Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022). "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (internal citations omitted). "Discriminatory intent may be proved by direct or indirect evidence." *FDIC v. Henderson*, 940 F.2d 465, 471 (9th Cir. 1991).

A plaintiff may state a clam under 28 U.S.C. § 1983 for a violation of the Equal Protection Clause in two ways. First, a plaintiff may show that a defendant acted with an intent or purpose to discriminate against the plaintiff based upon their membership in a protected class. *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). Second, if the action in question does not involve a plaintiff's membership in a suspect class, a plaintiff may establish an equal protection claim under the "class of one" theory by showing they were intentionally treated differently from other similarly situated individuals without a rational basis for the difference in treatment. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008).

The DeGrosses allege the Department's policy "places burdensome restrictions on applicants with religious beliefs that the Department disfavors[,]" and "invidiously discriminates based on religion and treats the Plaintiffs worse than similarly situated persons who do not share their religious beliefs." (Dkt. No. 41 at 44–45.) The DeGrosses specifically identify their "equal-protection claim parallels their free-exercise claim" (Dkt. No. 53 at 24), which means it is

premised on a class-based theory. Absent factual allegations that Defendants were motivated by discriminatory intent based on the DeGrosses' protected class, the class-based theory fails. And because the DeGrosses advance a class-based theory, the Court finds the "class-of-one" theory has not been plausibly alleged. Nor have the DeGrosses advanced any argument that the "class-of-one" theory applies in this case. (*See id*. at 24–27.) Therefore, the Court DISMISSES the DeGrosses' equal protection claim with leave to amend.

### D. The DeGrosses' Claims Against Secretary Ross Hunter in His Personal Capacity

Though the DeGrosses sue numerous individuals in their official capacity, they sue former Department Secretary Ross Hunter in his individual capacity. (*See* Dkt. No. 41 at 1.) Defendants argue the DeGrosses' claims against former Department Secretary Ross Hunter should be dismissed because they fail to allege he was personally involved in their attempt to apply for a license. (Dkt. No. 51 at 18–20.)

To state a viable personal-capacity claim against a defendant under 28 U.S.C. § 1983, however, a plaintiff must allege facts showing the defendant's personal participation in the alleged deprivation of constitutional rights. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant."); *see also Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). The Ninth Circuit has held that an immediate supervisor may be held liable for a subordinate's violations of the right to free speech if the supervisor knows about the violation and acquiesces therein. *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1075 (9th Cir. 2012). The supervisor need not specifically intend a constitutional violation. *See id.* "But the supervisor's acquiescence must take place while the

constitutional violation is 'ongoing.'" *Moon v. Washington State U.*, No. 2:24-CV-00327-RLP, 2025 WL 790632, at *5 (E.D. Wash. Mar. 12, 2025) (emphasis added) (quoting *Riley's American Heritage Farms v. Elasser*, 32 F.4th 707, 724 (9th Cir. 2022).

The DeGrosses rely heavily on *OSU Student Alliance*. There, the publisher of a conservative school newspaper sued university officials under § 1983 on the ground that the school retaliated against it by limiting the distribution of its newspaper on campus, pursuant to an unwritten policy. *See id.* at 1058–1060. In addition to suing the director of facilities services, who had actually applied the policy to the newspaper, the plaintiff also sued the president and vice president of the university who had not been directly involved in enforcement of the policy but had been informed about the application of the policy and done nothing to stop it. *See id.* at 1070–1071. The Ninth Circuit held that "allegations of facts that demonstrate an immediate supervisor knew about the subordinate violating another's federal constitutional right to free speech, and acquiescence in that violation, suffice to state free speech violations under the First and Fourteenth Amendments." *Id.* at 1075. Therefore, the president and vice president of the university could be held liable under § 1983 for the continued enforcement of the retaliatory policy. *Id.* By contrast, the vice provost for student affairs, who merely received the "first email message complaining" about the policy, *id.* at 1078, and neither knew nor acquiesced in the decision to continue applying the policy to the paper, could not be held liable, *see id.* at 1078–1079.

Here, the DeGrosses have failed to plead facts showing Hunter was the Secretary of DCYF while the DeGrosses' constitutional rights were violated. Hunter left his role on January 15, 2025, the DeGrosses submitted a license waiver on January 23, 2025, and they received their foster care license subject to certain restrictions on August 7, 2025. (Dkt. Nos. 33 at 1–2; 41 at

36.) Thus, any constitutional violation occurred *after* Hunter left his position, meaning he could not be held personally liable for the violation.

Notwithstanding, the DeGrosses argues that because Hunter was the Secretary of DCYF at the time Policy § 1520 was adopted, there is a "'plausible inference that [Hunter] was responsible for the continued operation' of § 1520, and that § 1520 led to the DeGrosses' injury, is sufficient." (Dkt. No. 53 at 29) (quoting *OSU*, 699 F.3d at 1076). But even accepting this argument, Hunter was not responsible for the continued operation of Policy § 1520 once Hunter left DCYF and Hunter left DCYF before the DeGrosses submitted a license renewal application. It, therefore, is not plausible Hunter was responsible for the continued operation of Policy § 1520 when the DeGrosses allege their constitutional rights were violated.

Because the DeGrosses have failed to state a plausible claim against former Secretary Hunter in his personal capacity, those claims are DISMISSED.[8,9]

### E. Leave to Amend

Leave to amend should be granted "freely" when justice so requires. Fed. R. Civ. P. 15(a). The Ninth Circuit maintains a policy of "extreme liberality generally in favoring amendments to pleadings." *Rosenberg Bros. & Co. v. Arnold*, 283 F.2d 406, 406 (9th Cir. 1960). Reasons "such as undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies . . . undue prejudice to the opposing party . . . [or] futility" may support denial of leave to amend. *Foman v. Davis*, 371 U.S. 178, 182 (1962). A district court "should grant leave

---

[8] The Court does not reach the question of sovereign immunity or qualified immunity because it has dismissed the federal claims against Hunter in his personal capacity.

[9] The Court grants the DeGrosses leave to amend their complaint to address these deficiencies. However, the Court questions any ability to show personal liability on behalf of Hunter absent an allegation that the DeGrosses submitted a foster care license application when Hunter was the Secretary of DCYF.

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS (DKT. NO. 51) - 23

to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Servs.*, 911 F.2d 242, 247 (9th Cir. 1990).

Here, the DeGrosses have not requested leave to amend. Nonetheless, this is the first time the Court has ruled on the sufficiency of the DeGrosses' complaint, and it is possible the deficiencies the Court has identified above may be cured by the allegation of additional facts. *Id.* Accordingly, the DeGrosses are granted leave to amend.

**IV    CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss (Dkt. No. 51) is GRANTED in part and DENIED in part. Specifically, all claims against Defendant Ross Hunter in his personal capacity are DISMISSED with leave to amend. The DeGrosses' freedom of association claim under the First Amendment and equal protection claim under the Fourteenth Amendment are also DISMISSED with leave to amend. Any amended complaint must be filed no later than May 13, 2026.

Dated this 22nd day of April, 2026.

David G. Estudillo
United States District Judge